[Crim. No. 20003. May 10, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE RAYMOND PIERCE, Defendant and Appellant.

COUNSEL

Appellate Defenders, Inc., under appointment by the Supreme Court, Handy Horiye and Stephen J. Perrello, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler, Harley D. Mayfield and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant Pierce appeals from a judgment on a jury verdict convicting him of second degree murder. (Pen. Code, §§ 187, 189.) He contends that (1) prejudicial jury misconduct occurred during the course of the trial, (2) the evidence was insufficient to support the verdict, and (3) the court erred in refusing a certain jury instruction on reasonable doubt and in admitting a photograph of the fatal injury. We conclude the first of these contentions is meritorious and requires reversal of judgment.

Because there is an attack on the sufficiency of the evidence, the facts will be set forth at some length. Pierce is the coowner of a gas station in El Cajon. On the night before the murder he played poker at his home until 4:30 a.m., losing about $1,300. During the course of the game, one of Pierce's employees telephoned to report that the attendant scheduled to work the midnight shift had called in sick. Pierce told the employee to contact Dale Huffington, a new employee, and ask that Huffington cover for the ill man. In a subsequent phone call, Pierce learned that Huffington had refused to come in at midnight. Pierce then directed that Huffington report for the day shift at 8 a.m.

Both Pierce and Huffington arrived at the gas station at 8 o'clock. Huffington went to work pumping gas and Pierce busied himself about the office. Shortly after 9, Pierce told Bruce Ballard, a mechanic working in the lube area of the station, that he had received a service call for a yellow Cougar automobile needing assistance on a nearby street. No one else had heard the phone ring. Ballard entered the station's tow truck to answer the call, but noticed the vehicle was almost out of gas. He drove the truck to the gas pumps, and then returned to the lube bay to report to Pierce. When he arrived, he saw Pierce behind a flight of stairs in the

storage room, bent over and clutching what Ballard thought was a red-handled windshield squeegee. Pierce dropped the instrument and walked out to the gas pumps with Ballard. According to Ballard, Pierce was acting strangely. They fueled the truck and, as Ballard was about to leave, Pierce said one or two armed men had entered the station over the back fence. He told Ballard to notify the police. Pierce went back into the station and Ballard drove around the corner, out of sight of the station. After an unsuccessful attempt to use the phone at a nearby residence, Ballard managed to contact the police on his CB radio. He then drove to an adjacent gas station to await the arrival of patrol officers.

Meanwhile, a customer had pulled up to the gas pumps at Pierce's station and had begun to put gas into his car. He saw no one, but heard hammering sounds, like metal on metal, coming from the lube bay. Shortly thereafter the police arrived, surrounding the station. Neither Ballard, the customer, nor the officers saw anyone leave the premises. The police cautiously entered the storage room. Pierce was on the floor, crawling towards the door; Huffington was slumped in a corner, a hammer embedded in his skull. There were blood spatters on Pierce's hands and clothing.

Paramedics transported Pierce and Huffington to the hospital. The hammer, by now dislodged from Huffington's skull, had been handled by several people at the scene. Huffington died in the emergency room. There were no visible injuries to Pierce, although one physician found swelling and evidence of a muscle spasm in his lower back.

Pierce told the police, and testified at trial, that after he sent Ballard on the service call, Huffington called out from the back room. Pierce went to investigate, and on entering the storeroom, saw a man wearing a red windbreaker jacket and stocking mask. The man had a .38 caliber revolver in his left hand, and with his right hand was hitting Huffington, who apparently had become hysterical. Pierce could not recall if he was using his fist or a weapon. Meanwhile, Ballard had returned to the lube bay after discovering the tow truck needed gas. The assailant instructed Pierce to get rid of Ballard. After Pierce complied, the robber ordered him into the office and emptied the cash register. Pierce was then led back to the storeroom; just after entering, he was assertedly struck from behind with a blunt instrument and fell on top of Huffington's nearly supine body. Pierce testified he believed there may have been an accomplice in the storeroom.

Police investigators could find no sign that anyone had climbed the fence at the rear of the station, nor could they locate anyone remembering a disabled yellow Cougar. They did learn Pierce was having financial difficulties. Pierce carried robbery insurance with coverage to $1,000.

At trial, there was conflicting testimony as to the amount of money, if any, missing from the cash register. There was also expert testimony that the bloodstains on Pierce's clothing were consistent with his being in the storeroom when the fatal blows were struck.

I

**(1)** Pierce's primary contention is that he was prejudiced by jury misconduct occurring during the course of trial. On voir dire a prospective juror named Seymour acknowledged that he was "Very, very familiar" with the case and that one of the first policemen to arrive on the scene, Officer Carl Case, was a neighbor and "very personal friend of mine." The prosecutor advised the court that he intended to call Case as a witness. The court and defense counsel immediately proposed to excuse Seymour, but the prosecutor suggested further inquiry. Although Seymour admitted he had previously spoken with Case about the crime, he asserted that he would give no special weight to Case's testimony and in particular that he could refrain from having any conversations outside the courtroom about the trial. Seymour was eventually seated without challenge, and was later elected foreman. At adjournment the court fully admonished the jurors against talking about the case among themselves or with third persons, emphasizing their solemn obligation to avoid any such contacts. The jurors all agreed to remember and obey the admonition, which the court thereafter repeated to them at the end of each day of the proceedings.

Despite the foregoing promises and warnings, Seymour subsequently approached Case at his home and talked with him about the trial. In the course of the conversation Seymour asked and Case answered several questions about the state of the evidence and the district attorney's method of presenting his case. The incident took place after Case had testified for the prosecution and the People had rested, and while Pierce was putting on his defense. Some two weeks later, after the jury had returned its verdict of guilty, one of Case's supervisors overheard him discussing his prior contact with Seymour. The supervisor reported the matter to the police chief, and the police department and the district

attorney's office conducted a joint investigation into the incident. Their reports were furnished to the court and to defense counsel.

The reports disclosed four matters relating to the trial that Seymour had discussed with Case. Thus Seymour asked Case why fingerprints had not been taken from the murder weapon. Case replied that the surface of the handle was such as to make it difficult to lift latent prints; and he further suggested that any such prints would be of debatable value because Pierce owned the hammer and both he and his employees had undoubtedly handled it in the course of their work. Seymour also asked Case why the jury had not been shown all the photographs used in the trial. Case did not know which photographs he was referring to, but explained that they may have been withheld from the jury because they were "gruesome."[1] Two lesser matters were also discussed. According to Case, Seymour asked him why the district attorney would bring up a point and then drop it, and Case replied that he did not know what the prosecution's tactic was; Seymour denied asking this question. Also according to Case, Seymour queried the adequacy of the police sketch of the crime scene and said that he and other jurors wanted to see the room where the murder took place; Case could not recall his answer, and Seymour stated he did not remember asking the question.[2]

Upon receipt of this information, Pierce immediately moved for a new trial. (Pen. Code, § 1181, subd. 3.) Rather than hold an evidentiary hearing, however, the court relied exclusively on the investigatory reports prepared by the police and the district attorney.[3] The court denied the motion, ruling that Seymour's act of discussing the trial with Case did not result in a miscarriage of justice because it was not "reasonably probable

---

[1]The adjective that Case used in this regard was variously reported by different investigators as "gruesome," "shocking," "inflammatory," and having "a traumatic effect" on the jury. In his own interview with the investigators Seymour claimed it was Case who brought up the issue by asking if he had seen the photographs used in the trial; Seymour replied he had not, but assumed he would see them in the jury room; and Case then explained that the jurors are often not shown the "gory" photographs because it might "influence" them.

[2]During their deliberations, the jury, speaking through their foreman Seymour, asked the court for permission to view the scene. The court denied the request.

[3]Although "incompetent testimony, such as hearsay . . . , if received without objection takes on the attributes of competent proof" (*Berry* v. *Chrome Crankshaft Co.* (1958) 159 Cal.App.2d 549, 552 [324 P.2d 70]), we strongly disapprove of the substitution of unsworn police reports and summaries for affidavits or testimony of the percipient witnesses. A hearing in open court would have been particularly appropriate to ascertain the relevant facts in this matter, because both Seymour and Case were initially evasive about the scope and content of their conversation. (But cf. *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104] [stating rule in civil cases].)

that a result more favorable to the defendant would have been reached in the absence of the error." (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) As will appear, the court used an incorrect standard of prejudice in the circumstances.

There is no question that juror Seymour committed serious misconduct. Penal Code section 1122 commands that at each adjournment prior to submission the court must admonish the jurors that "it is their duty not to converse among themselves or with anyone else on any subject connected with the trial . . . ." The jury herein were so instructed. Nevertheless, in derogation of his oath as a juror and his specific promise on voir dire not to engage in any such conversations, Seymour held the above-described consultation with Officer Case during the course of the trial. In *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156-157 [141 Cal.Rptr. 698, 570 P.2d 1050], we unanimously ruled that it was serious misconduct when a juror—also, as in the case at bar, the foreman—contacted an attorney acquaintance during deliberations and asked him questions of law pertaining to the trial then in progress. The same rule is here applicable: a discussion of the state of the evidence is no less a "subject connected with the trial" within the meaning of section 1122 than is a discussion of the governing law. In either event, "Such conduct in clear violation of the trial court's admonitions interjects outside views into the jury room and creates a high potential for prejudice." (*Honeycutt,* at p. 157.)

In determining the extent of that prejudice, moreover, the test is not the *Watson* standard applied by the trial court. That test is appropriate when the court is judging the effect of an error of law that it committed during the trial, such as misdirection of the jury or an incorrect evidentiary ruling. (Pen. Code, § 1181, subd. 5.) ▆ By contrast, as we reiterated in *Honeycutt* (at p. 156), jury misconduct raises a presumption of prejudice; and unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial. (See also *In re Winchester* (1960) 53 Cal.2d 528, 534-535 [2 Cal.Rptr. 296, 348 P.2d 904]; *People* v. *Wong Loung* (1911) 159 Cal. 520, 528-529 [114 P. 829]; *People* v. *Conkling* (1896) 111 Cal. 616, 628 [44 P. 314]; *People* v. *Guzman* (1977) 66 Cal.App.3d 549, 559 [136 Cal.Rptr. 163]; accord, *Remmer* v. *United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 655-656, 74 S.Ct. 450].)

▆ The People failed to sustain that burden. First, the prosecution submitted an investigative report of an interview with Seymour in which

the juror told the police that his conversation with Case had not influenced his vote on the verdict of guilt. Even if such evidence had been offered in the proper form of an affidavit or testimony by Seymour, however, it would not have been "admissible to show the effect of such . . . conduct . . . upon a juror either in influencing him to assent to . . . the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

The prosecution also presented investigative reports reciting that each of the 11 other jurors had signed declarations asserting that at no time during the trial or deliberations did Seymour mention he knew a police officer or had any information other than that presented in court. If the declarations themselves had been offered (see Evid. Code, § 1500), they would have been admissible under Evidence Code section 1150 to prove the fact asserted.[4] But that evidence would not have rebutted the presumption that the 12th juror, Seymour, was not impartial. Pierce was "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." (*Parker* v. *Gladden* (1966) 385 U.S. 363, 366 [17 L.Ed.2d 420, 423, 87 S.Ct. 468].) It would be sheer speculation to assume that absent his conversation with Case, Seymour would necessarily have voted to convict; rather, he might well have held out for acquittal, or even succeeded in persuading his fellow jurors that a reasonable doubt as to Pierce's guilt existed. ▮ Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 265-266 [148 Cal.Rptr. 890, 583 P.2d 748]), it is settled that a conviction cannot stand if even a single juror has been improperly influenced. (See, e.g., *People* v. *Honeycutt, supra,* 20 Cal.3d at p. 158; accord, *id.,* at pp. 161-162 (conc. opn. of Richardson, J.).)

▮ Finally, in his brief on appeal the Attorney General seeks to rebut the presumption of prejudice by addressing the content of the communication from Officer Case. He contends that the communication could not have affected the outcome of the trial because it either had no probative value (see, e.g., *People* v. *Crosby* (1956) 139 Cal.App.2d 101, 106 [292 P.2d 922] [juror asked police witness for a cup with which to take an aspirin]) or was cumulative of evidence already introduced (see, e.g., *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 20-25 [147 Cal.Rptr. 208] [juror brought government topographical survey maps into jury room]). The record, however, is otherwise. The questions that Seymour asked of Officer Case did not deal with mere social amenities unrelated to the trial,

---

[4]Most of the jurors also alleged that Seymour "did not influence" their verdict. Such allegations, of course, would have been inadmissible under section 1150.

nor were his answers wholly duplicative of evidence properly admitted. On the contrary, it clearly appears from these inquiries that several days after the prosecution had rested, Seymour had doubts about the sufficiency of the People's case. In particular, he was concerned with the fact that no fingerprints had been lifted from the handle of the murder weapon. As noted above, Officer Case replied by explaining to him that the surface of the handle was such as to make that procedure difficult and in any event that prints would be of little value because several persons had used the hammer. The communication could have improperly influenced the outcome of the trial in several ways.

First, after holding the conversation Seymour could reasonably attribute the absence of fingerprints not to Pierce's innocence but to technical or practical difficulties in obtaining the evidence. The officer thus assuaged his doubts before Seymour even had the opportunity to express them to and discuss them with his fellow jurors. Second, in giving his explanation Officer Case was obviously speaking in large part as an expert; yet because the conversation was kept secret throughout the trial the defense was deprived of its right to confront the witness, inquire into his qualifications as an expert, and test the basis of his opinion on cross-examination. Finally, Case's explanation nullified as to Seymour one of the closing arguments of the defense, to wit, that the absence of Pierce's fingerprints on the murder weapon should raise a reasonable doubt in the minds of the jurors.[5]

We conclude, as in *Honeycutt* (20 Cal.3d at p. 158), that "Under these circumstances the presumption of prejudice was not rebutted but rather was reinforced by the evidence." Defendant is therefore entitled to a new trial, free from such serious jury misconduct as the record here reveals.

## II

Pierce next attacks the sufficiency of the evidence, contending it was legally inadequate to establish his guilt and to support the finding of second degree murder.

The United States Supreme Court has recently held that the double jeopardy clause of the Fifth Amendment bars retrial of a federal

---

[5]Thus defense counsel argued to the jury as follows: "What about fingerprints? Larry [Pierce] wasn't wearing any gloves. He had a hammer. We had something that should have been taken off of that. We had no evidence of fingerprints. . . . Why not? There ought to be. People leave fingerprints, but there's no fingerprints here."

criminal defendant after a reversal of his conviction ordered on the ground that the evidence introduced at trial was insufficient to support the verdict. (*Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141].) An appellate determination of insufficient evidence, reasoned the court, is tantamount to a finding that the trial judge should have directed a verdict of acquittal; since a retrial would be barred by such a verdict, a new trial is also improper after the equivalent decision on appeal. (*Id.,* at pp. 10-11, 16 [57 L.Ed.2d at pp. 9-10, 12-13].) In a companion case the high court held that the same rule also applies in state prosecutions when a claim of insufficient evidence is sustained on appeal under the same criteria as those used by a trial court in ruling on a motion for directed verdict. (*Greene* v. *Massey* (1978) 437 U.S. 19 [57 L.Ed.2d 15, 98 S.Ct. 2151].) Under California law these criteria are essentially the same (see, e.g., *People* v. *Reyes* (1974) 12 Cal.3d 486, 496-497 [116 Cal.Rptr. 217, 526 P.2d 225]); accordingly, the rule of *Burks* applies to trials conducted in our courts. In the case at bar we must therefore address Pierce's contention as to the sufficiency of the evidence because a retrial, which we here order, would be improper if his claim were meritorious.

■ When a defendant challenges the sufficiency of the evidence, the test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 570-571 [146 Cal.Rptr. 859, 580 P.2d 274], citing *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) ■ Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 424-425 [90 Cal.Rptr. 417, 475 P.2d 649].)

■ Here, there was adequate circumstantial evidence to establish that Pierce killed Huffington with malice aforethought. No person present saw the alleged "robbers" leaving the scene. Expert witnesses testified that the bloodstains on Pierce's clothing were consistent with his close proximity to the attack. The jury could reasonably have inferred that Pierce was tired and distraught from suffering a large loss· at poker the preceding evening, and angry at Huffington for refusing to work the midnight shift. They could also have inferred that Pierce invented the disabled yellow Cougar as a pretext to get Ballard out of the station; that Ballard, when he discovered the tow truck needed fuel, interrupted Pierce as the first blows were struck; and that Pierce, after sending Ballard on his way with a false story of a robbery in progress, returned to the storeroom to inflict the fatal wounds. Evaluation of the credibility of Pierce's

testimony was within the sole province of the jury, and they were free to disregard his version of the killing.

### III

Finally, Pierce contends the court erred in refusing a particular jury instruction and in admitting into evidence a color photograph of the victim's head injuries. We briefly discuss each point for the benefit of the trial court on remand.

■ Pierce requested an instruction on reasonable doubt that focused on identification of the defendant as the person responsible for the crime. The trial court refused the instruction and instead gave CALJIC No. 2.90, derived from Penal Code section 1096. Penal Code section 1096a provides, "In charging a jury, the court may read . . . section 1096 of this code, and no further instruction . . . defining reasonable doubt need be given." Notwithstanding section 1096a, a defendant upon proper request has a right to an instruction that directs attention to specific evidence from which the jury could infer a reasonable doubt. (*People* v. *Granados* (1957) 49 Cal.2d 490, 496 [319 P.2d 346], and cases cited.) The instruction requested here did not focus on specific evidence, however, but simply restated the presumption of innocence; accordingly, the court did not err in refusing it. (Cf. *People* v. *Gomez* (1972) 24 Cal.App.3d 486, 490 [100 Cal.Rptr. 896].)

■ Pierce's contention that· the trial court erred in admitting a graphic photograph of Huffington's injuries is similarly without merit. Evidence Code section 352 vests the court with broad discretion to weigh the prejudicial effect of proffered evidence against its probative value. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 295 [82 Cal.Rptr. 161, 461 P.2d 361].) No abuse of that discretion appears: the photograph was not cumulative, and was highly relevant evidence on the issue of malice. As the Court of Appeal said in *People* v. *Long* (1974) 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530], "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . ." (Fn. omitted.)

The judgment is reversed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.