[Civ. No. 20783. Fourth Dist., Div. Two. Apr. 21, 1982.]

**PETER P. ANDREWS et al., Plaintiffs and Appellants, v. COUNTY OF ORANGE, Defendant and Respondent.**

948

## COUNSEL

Fadem, Berger & Norton and Michael M. Berger for Plaintiffs and Appellants.

Goebel & Monaghan, Louis E. Goebel, Luce, Forward, Hamilton & Scripps, Eckmann, Lodge & Gatzke and Michael Scott Gatzke for Defendant and Respondent.

## OPINION

TAMURA, J.*—Owners of fifty-four (54) homes located near John Wayne Orange County Airport (airport) filed inverse condemnation actions against the County of Orange claiming that the county had damaged and diminished the market value of their homes by subjecting them to frequent jet overflights, fallout of soot and fumes from jet aircraft, excessive noise and vibrations from "runups" (warm up of jet engines), take offs, and landings. Six of the plaintiffs also sued in negligence, nuisance and trespass for damages for personal injuries and emotional distress caused by the noise, vibrations and fallout from jet aircraft using the airport. Four of these six claimants also sought recovery on the theory that the county was operating the airport without a valid permit.

In a consolidated trial, a nonsuit was granted on the cause of action based on the alleged lack of a valid permit and the case was submitted to the jury on the inverse condemnation cause of action as to all plaintiffs and on the cause of action for personal injuries and emotional distress as to six of the plaintiffs. The jury returned special verdicts for defendant on all counts, finding that the value of the easements alleged-

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

ly taken over plaintiffs' properties was zero dollars and that plaintiffs had suffered no damages by reason of defendant's actions. Plaintiffs' motion for a new trial was denied and they appeal from the judgment on the jury verdict.

Plaintiffs' primary contention on appeal is that they were deprived of a fair trial by reason of jury misconduct. Their other contentions relate to evidentiary rulings and claimed instructional errors.

## FACTS

Subject to amplification when we consider the specific issues, the following summary of the pertinent facts will suffice to place the issues in their proper setting:

### (a) *The Airport*

The county operates the airport under an "Airport Permit" issued by the California Aeronautics Commission in 1949. Until the middle 1960's only propeller-driven aircraft used the airport; its sole runway was 4,800 feet long and would bear a weight of only 12,500 pounds. In 1964 or 1965 the old runway was discontinued and two new ones were built—a 5,700-foot runway able to bear 67,000 pounds and thus suitable for jet aircraft, and a shorter runway for conventional propeller-driven planes. The new runways extend in a southerly direction, while the old one ran southwest.

In 1967 commercial jets began using the airport. Initially there were only four such flights a day but the number increased steadily over the years so that at the time of trial there were forty-one scheduled flights a day. In the early 1970's small jets used for training, for charters, and by business corporations began using the airport. At first there was only occasional usage by transient small jets; by 1977, however, at least two aviation companies with fleets of small jets (four to eight planes) were operating at the airport, and a number of business corporations based their company jets there. In 1977 small jet traffic at the airport averaged 15 flights per day.

### (b) *Plaintiffs' Properties*

Plaintiffs are homeowners whose residences are located south of the airport. All of plaintiffs' homes are in a geographic area which airport

officials have designated a "noise sensitive area." According to the airport's definition, noise sensitive areas are residential areas which lie "under or near the flight tracks" of jet aircraft using the airport.

(c) *The Trial*

Trial lasted over three months. The jury heard testimony from three expert witnesses concerning the devaluation of plaintiffs' homes resulting from jet noise and fallout. Plaintiffs' appraiser testified that all of plaintiffs' homes had suffered substantial diminution in value due to jet traffic. The county presented two appraisers. One testified that none of the homes had suffered loss in value because of the jets. The other was of the opinion that jet noise and fallout caused nine of the homes to suffer loss in value ranging from $5,500 to $7,000 for seven, $10,500 for one, and $50,000 for one. The jury viewed most of the subject homes during field trips on four separate days.

The court excluded testimony on three matters offered by the six plaintiffs who pursued the tort cause of action for damages for personal injuries and emotional distress. The court excluded evidence concerning emotional disturbance allegedly caused by aircraft in flight. It also sustained the county's objection to plaintiffs' offer to prove that certain measures could have been taken by the county to alleviate the noise problem at the airport (e.g., extension or varying of curfew hours; enforcement of existing curfew; banning private jets, jet taxis, or jet aircraft flight instruction; installing noise limitation system). Finally, the court excluded evidence concerning alleged assurances by the county board of supervisors in 1962 that no jets would use the airport, and in 1967 that there would be no jet noise problem. Plaintiffs maintained that the supervisors' failure to live up to those assurances contributed to plaintiffs' emotional disturbance.

On the inverse condemnation cause of action, the court refused plaintiffs' requested instruction that the jury should determine the value of the "loss of use" of plaintiffs' homes from September 1967 (when jets began using the airport) to May 8, 1978, (the date of value).[1] As to the

---

[1]The refused instruction provided: "You are to determine the value of the loss of use of the homeowners' properties from September, 1967, to May 8, 1978.

"In determining the value of that lost use you may consider all interference with the enjoyment of one's homes and outdoor areas for the shelter, comfort, security, communication, rest, sleep and freedom from fallout which you decide the homeowners have lost."

personal injury cause of action, the court instructed the jury that it could not award damages for physical injuries or emotional distress resulting from aircraft in flight.[2]

After eight days of deliberation, the jury returned verdicts for defendant on all counts. Plaintiffs moved for additur and/or new trial on grounds of inadequate damages, insufficient evidence, jury misconduct and errors of law. The alleged incidents of jury misconduct were based on juror declarations and included various comments made by jurors during the field trips to inspect the homes, consideration during deliberations of matters on which no evidence had been presented, and failure of two of the jurors to participate in all of the deliberations and certain other juror conduct. The judge denied the motion for new trial.

## CONTENTIONS ON APPEAL

Plaintiffs contend that there were incidents of flagrant juror misconduct which deprived them of a fair trial and that the court abused its discretion in denying them a new trial on that ground. They also contend that the court erred in refusing to instruct the jury that they should value and award damages for plaintiffs' "loss of use" of their properties from September 1967 to May 1978. (See fn. 1, *ante*.)

The six plaintiffs who sought damages for personal injuries and emotional disturbance raise three additional contentions. First, they contend the court erred in instructing the jury that they may not award damage for physical injuries or emotional distress resulting from aircraft in flight (see fn. 2, *ante*). Second, they maintain they should have been allowed to introduce evidence concerning measures which the county might have taken to alleviate the disturbances caused by jet aircraft. Third, they contend the court erred in excluding evidence of misrepresentations made by county supervisors concerning jet use of the airport.

The four plaintiffs who alleged a cause of action based on defendant's alleged failure to obtain a valid airport permit challenge the correctness of the order granting the county's motion for nonsuit on that cause of action.

---

[2]The instruction given provided: "As to each of the theories of negligence, nuisance, and trespass, you are instructed that you may not award damages for emotional distress and/or physical injuries resulting from aircraft in flight. You may award damages, if any, for emotional distress and/or physical injuries which are the proximate result of the operation and management of Orange County Airport, exclusive of the effects of aircraft in flight, under the three theories described."

In the ensuing discussion we·have concluded that the entire judgment, except as it pertains to the cause of action based on an alleged lack of a valid airport permit, must be reversed for jury misconduct. We have further concluded that the judgment on the personal injury and emotional distress cause of action must also be reversed for the rendition of the instruction that noise from jet aircraft in flight could not be considered and for certain evidentiary rulings.

## I

### Jury Misconduct

Preliminarily, we review the principles governing proof of jury misconduct and the evaluation of its prejudicial effect.

"Trial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) ■ The right to unbiased and unprejudiced jurors is an "inseparable and inalienable part" of the right to jury trial. (*People* v. *Hughes* (1961) 57 Cal.2d 89 [17 Cal.Rptr. 617, 367 P.2d 33]; *People* v. *Galloway* (1927) 202 Cal. 81, 92 [259 P. 332].) The guarantee is the right to 12 impartial jurors. (*Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 955 [161 Cal.Rptr. 377]; *Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356, 360 [97 Cal.Rptr. 589].)[3] ■ Subject to the restrictions of Evidence Code section 1150, a juror's affidavit may be used to impeach a verdict.[4] The statements made, or conduct, conditions or events relied upon as constituting misconduct must be objectively ascertainable and subject to corroboration. (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349-350 [78 Cal.Rptr. 196, 455 P.2d 132].) A verdict may not be impeached by an affidavit purporting to prove the subjective reasoning process of a juror which can neither be corroborated nor disproved. (*Id.*, at p. 349.)

---

[3]In civil cases the parties may, of course, agree in open court to a trial by a jury composed of a lesser number. (Cal. Const., art. I, § 16.)

[4]Evidence Code section 1150 provides: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

"(b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."

In civil cases a motion for new trial grounded on jury misconduct must be presented by affidavit. (*Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104].)

In criminal cases, jury misconduct raises a presumption of prejudice and unless the prosecution rebuts the presumption by proof that no prejudice actually resulted, defendant is entitled to a new trial. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) A similar principle governs jury misconduct in civil cases. (*Smith* v. *Covell, supra*, 100 Cal.App.3d 947, 953.) ■ Misconduct "unless shown by the prevailing party to have been harmless will invalidate the verdict." (*Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33, 36 [224 P.2d 808]; *Smith* v. *Covell, supra*, 100 Cal.App.3d 947, 953; see *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal. App.3d 384, 431 [82 Cal.Rptr. 1].) This does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside. (Code Civ. Proc., § 657, subd. 1[5]; see *City of Pleasant Hill* v. *First Baptist Church, supra*, 1 Cal.App.3d 384, 430; *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.* (1909) 156 Cal. 379, 398 [104 P. 312] [criticized on another point in *Lane* v. *Pacific Greyhound Lines* (1945) 26 Cal.2d 575, 583 (160 P.2d 21)]; *Deward* v. *Clough* (1966) 245 Cal.App.3d 439, 444 [54 Cal.Rptr. 68].)

■ The respective role of the trial court in passing upon a claim of jury misconduct and of an appellate court in reviewing an order denying a motion for new trial for jury misconduct may be briefly stated: It is the trial court's function to resolve conflicts in the evidence, to assess the credibility of the declarants, and to evaluate the prejudicial effect of the alleged misconduct. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 109 [95 Cal.Rptr. 516, 485 P.2d 1132].) ■ A denial of a motion for new trial grounded on jury misconduct implies a determination by the trial judge that the misconduct did not result in prejudice. (*Bardessono* v. *Michels, supra*, 3 Cal.3d 780, 795-796.) Consistent with the principle that a trial judge has wide discretion in ruling on a motion for new trial, an appellate court should accord great deference to a trial judge's evaluation of

---

[5]Code of Civil Procedure section 657 provides that a new trial may be granted "for any of the following causes, materially affecting the substantial rights of such party: [¶] 1. Irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial."

the prejudicial effect of jury misconduct. (*Bardessono* v. *Michels, supra,* 3 Cal.3d 780, 795-796.) However, in reviewing an order *denying* a motion for new trial based on jury misconduct, as distinguished from an order *granting* a new trial on that ground, a reviewing court has a constitutional obligation (Cal. Const., art. VI, § 13) to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial. (*Deward* v. *Clough, supra,* 245 Cal.App.2d 439, 445; cf. *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 872 [135 Cal.Rptr. 647, 558 P.2d 545]; *Tobler* v. *Chapman* (1973) 31 Cal. App.3d 568, 578-579 [107 Cal.Rptr. 614]; *Wilkinson* v. *Southern Pacific Co.* (1964) 224 Cal.App.2d 478, 484 [36 Cal.Rptr. 689].)

■ In support of the charges of misconduct in this case, plaintiffs submitted declarations of two jurors, forewoman Benz and Mrs. Dague, describing numerous incidents of alleged juror misconduct which we have summarized in the margin below.[6] Defendants submitted nine ju-

---

[6]Juror Benz declared:

(a) Juror O'Neil, when visiting properties, said one home was not worth $90,000—compared it to his own home. Juror Cleverly nodded agreement.

(b) Unidentified juror said the plaintiffs already have enough money.

(c) Juror DeHaven said "This whole thing is a big farce."

(d) Many jurors commented after first viewing of homes that noise was not bad.

(e) Juror O'Neil came to court "hungover" twice during deliberations.

(f) Jurors Potter and DeHaven voluntarily separated themselves from other jurors during deliberations, sitting in an anteroom and refusing to participate in deliberations.

(g) Juror DeHaven colored in coloring books and played solitaire on several occasions during deliberations.

(h) Juror Kincaid offered to change her vote during recapitulation when it did not agree with the votes of others.

Juror Dague corroborated (a), (b), (c), (d), (f), (g), (h) of Benz's declaration. She also stated:

(1) Juror Kincaid asked why plaintiffs needed money (apparently a rhetorical question) on one occasion while leaving jury box.

(2) Juror O'Neil said "S.O.S.—same old shit" while going through a house and repeated comment on visiting other properties.

(3) Juror Cleverly commented "S.O.S. - same old stuff" in a similar situation.

(4) Juror O'Neil told her on bus returning from first property viewing that Juror Kincaid had said that if jury deliberated at that point they would be done in 10 minutes.

(5) Juror DeHaven said during deliberations that some of the "runup" noise was from generators, not from jet airplanes (no evidence presented on generators).

(6) Juror DeHaven said he had talked with a real estate broker who told him the $20,000 mark down from the asking price on one plaintiff's house was not unusual.

(7) Juror Kincaid said she had discussed the trial with her husband, though he had not tried to tell her what to do.

(8) Juror Kincaid said she had talked with a friend in real estate who had told her it was not unusual for a house to be on the market for a number of months.

ror declarations summarized below either denying that certain of the incidents reported by jurors Benz and Dague occurred or attempting to explain those which were admitted to have occurred.[7] Plaintiffs subsequently filed supplemental rebuttal declarations summarized below which described four alleged instances of misconduct not previously reported and refuted other jurors' descriptions and explanations of incidents reported earlier.[8]

In fulfilling our obligation to make an independent assessment of the prejudicial effect of the jury misconduct, we must first ascertain what

---

[7]Seven jurors remembered the "runup," generator comment, but all agreed that they had been aware it was not evidence and had not considered it in their discussions. Seven jurors stated Potter or Potter and DeHaven had spent some time in anteroom, but all agreed they could still hear the deliberations and participate in votes. Most jurors did not hear other jurors' reported comments during course of trial. The jurors reported to have made comments either denied them or explained that the comments were not meant to express opinions on evidence.

[8]Juror Dague declared:

(a) DeHaven and O'Neil talked about generators as cause of "runup" noise for more than one-half hour.

(b) Mrs. Cleverly commented when seeing sewing project on visit to a home "*Really*, as if they need to."

(c) Matters were discussed when Mrs. Potter was in the restroom for protracted periods and she voted on them when she returned.

Juror Benz declared:

(a) DeHaven pursued generator topic for more than one-half hour.

(b) DeHaven might not have heard deliberations when in anteroom because she had to call loudly to get his attention for a vote.

(c) When Mrs. Potter was in restoom they had to knock loudly on the door to get her attention to vote.

(d) Juror Kincaid said she was voting for no emotional disturbance award because "People can't tell the generator noise from the runup noise."

Juror Oldmen declared:

(a) Many jurors commented after first visit to homes that noise was not bad.

(b) Mr. DeHaven said whole thing was a farce.

(c) DeHaven made the generator noise argument during deliberations.

(d) Potter once refused to rejoin other jurors when she was in anteroom and was asked to return.

(e) Two or three times DeHaven refused request to rejoin other jurors when he was in anteroom.

(f) DeHaven and Potter colored in coloring books during deliberations.

(g) Mrs. Kincaid did offer to change vote if others wanted her to.

(h) Mrs. Kincaid mentioned her real estate friend's comments on length of time a house might be on market during deliberations.

(i) Mrs. Kincaid said she talked with her husband about trial but he did not try to tell her what to do.

Juror Breckenridge who had been excused during trial stated: In a conversation with Juror Cleverly while returning from a field trip to inspect properties, Cleverly said visiting properties hurt plaintiffs' case because the noise was not bad.

misconduct, if any, occurred. In making that determination, we note that in denying the motion for new trial, the judge commented on the inadequate damage and insufficiency of the evidence grounds for the motion but made no specific reference to the jury misconduct ground. We must therefore assume that where there was conflicting evidence, the trial court impliedly resolved those conflicts in favor of the prevailing party. So viewing the evidence, we are left with incidents of misconduct which were either admitted or established by uncontroverted declarations. Some of these were so trivial that they could hardly be characterized as misconduct and could not have affected the fairness of the trial.[9] Others, when considered singly, may not have been of sufficient gravity to have deprived plaintiffs of a fair trial but, as we explain below, when added to Juror DeHaven's misconduct, they contributed to the deprivation of a fair and impartial jury.[10]

Juror DeHaven committed serious acts of misconduct. During a field trip to inspect the homes, when an unidentified juror said: "Those people already have enough money, why should they get more?" juror DeHaven said: "This whole thing is a big farce." DeHaven admitted making the statement but sought to explain it by saying he was only expressing his feelings about the jury view of the homes. In the context in which the statement was made, however, the inescapable inference is that he was referring to the trial itself. The statement evidenced either a prejudgment of the case in violation of the statutorily required admonition (Code Civ. Proc., § 611), or a concealment of bias on voir dire or both.[11] (See *Smith* v. *Covell, supra,* 100 Cal.App.3d 947, 953; *Weath-*

---

[9]For example, we could place in the category of trivial the charge that two of the jurors colored in coloring books and one played solitaire on several occasions during deliberations. The same may be said of the charge that during deliberations juror Potter occasionally sat in the anteroom adjacent to the jury room because she was ill and needed to be near the restroom. According to the counterdeclaration, she was able to hear and participate in the deliberations.

[10]The incidents were as follows: Juror O'Neill admitted that on one of the fields trips to inspect the home, he made the earthy remark: "S.O.S. - same old shit." He also admitted commenting that one of the houses was not worth $90,000 because his house which was better was not worth that much.

Juror Kincaid admitted she talked to her husband about the trial but stated she neither sought nor received his view of the case. Also, during the deliberations, she commented that her realtor friend told her it was not unusual for a house to be on the market for several months.

[11]In *Deward* v. *Clough, supra,* 245 Cal.App.2d 439, on the last day of trial before arguments had been completed and the jury instructed, as the jurors came out of the courtroom and headed for the jury room but found it locked, one juror said to several others: """I don't see why they don't open up the jury room now. We could bring in a verdict already.""" The jurors who were present all laughed. The reviewing court held

ers v. *Kaiser Foundation Hospitals, supra*, 5 Cal.3d 98, 104.) It is doubtful that Juror DeHaven's self-serving statement concerning his state of mind when he made the utterance which could neither be corroborated nor disproved can be properly considered to rebut the presumption of prejudice. (Evid. Code, § 1150; see *People* v. *Pierce, supra*, 24 Cal.3d 199, 208, fn. 4.) But even accepting his explanation that he was referring to the jury view of the homes, the statement still evinces prejudgment or bias. It indicates that DeHaven had already made up his mind and that the jury view was therefore a waste of time, a "big farce." This was egregious misconduct. The court is in session during a jury view and the view constitutes the taking of evidence. (Code Civ. Proc., § 651; *City of Pleasant Hill* v. *First Baptist Church, supra*, 1 Cal.App.3d 384, 414; *People* v. *Al G. Smith Co. Ltd.* (1948) 86 Cal.App.2d 308, 310 [194 P.2d 750].) The fact that all of the other jurors may not have overheard DeHaven's statement does not rebut the presumption of prejudice from this prejudgment of the case or concealment of bias on voir dire. (See *People* v. *Pierce, supra*, 24 Cal.3d 199, 208.)

Also, during the deliberations, Juror DeHaven reported that a real estate broker had told him that the $20,000 mark down on plaintiff Duncan's house was not unusual. DeHaven also said that some of the ground noise of which plaintiffs complained was not "runup" noise but was "starter generator noise." There had been no evidence on starter generator noise. DeHaven admits discussing the matter but says it was done only "casually." Declarations of jurors filed in rebuttal which were uncontradicted, however, state that DeHaven discussed the subject of starter generator noise for more than a half hour despite requests that he desist because there was no evidence on the subject. Communication to fellow jurors of information on an issue under litigation except in open court and in the manner provided by law constitutes misconduct. (*People* v. *Lessard* (1962) 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46]; *Smith* v. *Covell, supra*, 100 Cal.App.3d 947, 952-953; *People* v. *Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 598 [128 Cal.Rptr. 697]; *People* ex rel. *Dept. Pub. Wks.* v. *Curtis* (1967) 255 Cal.App.2d 378, 390 [63 Cal.Rptr. 138]; *Kritzer* v. *Citron, supra*, 101 Cal.App.2d 33, 36.) Declarations from other jurors stated that everyone "appeared to agree" that they could not properly consider DeHaven's

---

that the statement showed that the juror had prejudged the case; that this "was misconduct and it was serious." (*Id.*, at p. 444.) The court concluded that the misconduct resulted in an unfair trial and that the failure of the trial court to grant a new trial was prejudicial error.

comments on generator noise and that his statements played no part in the declarants' consideration of plaintiffs' claims. However, declarations concerning the effect DeHaven's comment had on a juror in influencing him or her to assent to or dissent from the verdict is inadmissible. (Evid. Code, § 1150.)

Finally, during deliberations Juror DeHaven separated himself from the others after an angry exchange with forewoman Benz and sat in a small anteroom adjacent to the jury room. One juror said that this occurred several times. DeHaven said it occurred once for about 15 minutes and that during that period he was able to hear the deliberations and participate in the voting. Three of the jurors, however, said DeHaven refused to reenter the jury room to deliberate when his presence was requested and the foreperson said she had to shout to get his attention to vote. A refusal to deliberate constitutes misconduct; the parties are entitled to the participation of all 12 jurors. If this were the only act of misconduct we would not deem it of sufficient consequence to affect the fairness of the trial. Bearing in mind the fact that the deliberations extended over a period of eight days, it would not have been unusual for tempers to flare occasionally. However, DeHaven's conduct during deliberations must be reviewed along with his other acts of misconduct in determining their prejudicial effect.

The acts of misconduct committed by juror DeHaven during the trial and deliberations reinforce our earlier evaluation of the import of his statement: "This whole thing is a big farce." The series of misconduct indicate his prejudgment of the case as well as possible concealment of bias on voir dire and deprived plaintiffs of a fair trial. The jury polling sheets show that the zero damage verdicts on the inverse condemnation cause of action as to nine of the homes involved was nine to three and that Juror DeHaven voted with the majority on all parcels including the nine.[12] As we noted earlier, one of the county's two appraisers testified that nine of the houses suffered damages ranging from $5,500 to a high of $50,000. Significantly, the vote on seven of those nine houses was nine to three. Manifestly, on the nine-to-three verdicts, disqualification of any one juror who voted with the majority would have resulted in a different verdict and caused prejudice. (*Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, 110; *Clemens* v. *Regents of University of California, supra,* 20 Cal.App.3d 356, 366-367; cf. *People* v. *Pierce,*

---

[12]We augmented the record on appeal on our own motion to add the jury polling sheets.

*supra*, 24 Cal.3d 199, 208; *People* v. *Honeycutt, supra*, 20 Cal.3d 150, 158.)

While the prejudice is not as apparent where DeHaven's vote was not crucial to the verdict, plaintiffs were entitled to the deliberations of 12 impartial jurors and prejudice must be presumed where they were denied that right. We noted earlier that some of the acts of misconduct committed by other jurors may not have been of sufficient gravity, standing alone, to have prejudiced plaintiffs. However, when we take into account the fact those acts of misconduct were committed by jurors who consistently voted with Juror DeHaven in making up the majority, they add to the probability that plaintiffs were denied a fair trial. For example, Juror O'Neill's earthy observation during the jury view of the homes ("S.O.S.—same old shit") and his statement that one of the houses was not worth $90,000 because his home was better but was not worth that much hardly reflected an attitude one would expect of a fair and impartial fact finder. Indeed, Juror O'Neill's statements indicate that he too had already made up his mind about the case even before the jury view.

Based upon a review of the entire record, including the evidence, we are of the opinion that jury misconduct resulted in a miscarriage of justice and requires a new trial as to all plaintiffs as to all causes of action, except as to the cause of action based upon an alleged lack of a valid airport permit. We realize that this sets at naught the fruits of an extended and costly trial. However, the cost of a new trial is a small price to pay for the vindication of the constitutional right to a trial by a fair and impartial jury, particularly where the issue at stake is whether the government has unreasonably intruded upon the rights of its people.

II

LOSS OF USE INSTRUCTION

■ Although the judgment as to the inverse condemnation cause of action must be reversed for jury misconduct, we address one other contention concerning that cause of action because of the likelihood the issue will arise on retrial.

Plaintiffs argue that they were entitled to have the court instruct the jury that they were to determine the "value of the loss of use of the

Homeowners' properties from September, 1967, [when commercial jets began using the airport] to May 8, 1978 [the date of value for most parcels]." (See fn. 1, *ante*, for text of the requested instruction.) Plaintiffs contend the requested instruction was designed to enable the jury to award them *Klopping* damages (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]) for loss of use and enjoyment of their properties for the period prior to the date of value, citing *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822], and *City of Los Angeles* v. *Monahan* (1976) 55 Cal. App.3d 846 [127 Cal.Rptr. 763].

The doctrine enunciated in *Klopping* v. *City of Whittier, supra*, 8 Cal.3d 39, permits recovery of damages either in an inverse or direct condemnation action for diminution in market value of property resulting from "unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation...." (*Id.*, at pp. 52, 58.) Recovery of *Klopping* damages in addition to the fair market value of the property condemned does not result in double recovery for the same loss. (*Stone* v. *City of Los Angeles, supra*, 51 Cal.App.3d 987, 993-994; *City of Los Angeles* v. *Monahan, supra*, 55 Cal.App.3d 846, 852.)

Here, however, there was no allegation or proof that the county had engaged in any *precondemnation* activity much less unreasonable precondemnation conduct. Plaintiffs' inverse condemnation cause of action was based entirely on the claim that the county had damaged and diminished the market value of their homes by subjecting them to jet overflight, fallout, and excessive noise from take offs and landings. Such damages are manifestly of a different character than damages from precondemnation activity. "The municipal owner and operator of an airport is liable [in inverse condemnation] for a taking or damaging of property when the owner of property in the vicinity of the airport can show a *measurable reduction in market value* resulting from the operation of the airport in such manner that the noise from aircraft using the airport causes a *substantial interference* with the use and enjoyment of the property, and the interference is sufficiently direct and sufficiently peculiar that the owner, if uncompensated, would pay more than his proper share to the public undertaking." (*Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 483-484, 493 [115 Cal.Rptr. 162]; italics supplied.) A municipality is not liable where the interference is so insubstantial that it does not result in a measurable diminution of the

market value of the property. It must also be borne in mind that the requested instruction only pertained to a claim for damage to property, not to a claim for damages for personal injuries or emotional distress which was sought by only six of the plaintiffs.

*Stone* v. *City of Los Angeles, supra*, 51 Cal.App.3d 987, and *City of Los Angeles* v. *Monahan, supra*, 55 Cal.App.3d 846, lend no support to plaintiffs' contention. Both cases involved *Klopping* damage claims for precondemnation activity. In *Monahan* the Court of Appeal upheld the trial court's implied determination that the homes had not suffered *Klopping* damage and distinguished *Stone* where the property owners recovered such damage. The *Monahan* court pointed out that in *Stone* the owners were prevented from making profitable use of their income property because of the threatened condemnation action whereas the claimed diminution in market value of the residential properties in *Monahan* was due entirely to the adverse effect of jet operations at the Los Angeles International Airport and not to any delay in bringing the condemnation actions.

The trial court properly refused to give the requested instruction that the jury determine "the value of the loss of use of the homeowners' properties from September 1967, to May 8, 1978."[13]

---

[13]The instruction was obviously designed to permit recovery of damages for alleged interference with use and enjoyment of the home from the time the jets first commenced using the airport. If the jury had awarded compensation to plaintiffs for the taking of an avigation easement over their properties, they would have been entitled to prejudgment interest on the award from the date the cause of action arose absent any statute of limitations problem. (Former Code Civ. Proc., § 1255b, subd. (a)(2), new Code Civ. Proc., § 1268.310; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556, 564-565 [118 Cal.Rptr. 687]; *Riverside County Flood etc. Dist.* v. *Halman* (1968) 262 Cal.App.2d 510, 514-515 [69 Cal.Rptr. 1].) It is only when flights substantially interfere with use and enjoyment of property and result in a diminution of market value that the cause of action arises. (*Aaron* v. *City of Los Angeles, supra*, 40 Cal.App.3d 471, 492; *Smart* v. *City of Los Angeles* (1980) 112 Cal.App.3d 232 [169 Cal.Rptr. 174].) This depends on the evaluation of such factors as "the frequency and level of the flights; the type of planes; the accompanying effects, such as noise or falling objects; the use of the property; the effect on values; the reasonable reactions of the humans below; and the impact upon animal and vegetable life." (*Jensen* v. *United States* (1962) 305 F.2d 444, 447 [158 Ct. Cl. 333], quoted in *Aaron* v. *City of Los Angeles, supra*, 40 Cal.App.3d 471, 491-492.) The question as to when property has been taken or damaged so as to entitle the property owner to prejudgment interest presents a mixed question of fact and law to be determined by the trial judge. (*Aaron* v. *City of Los Angeles, supra*, 40 Cal.App.3d 471, 484; *Riverside County Flood etc. Dist.* v. *Halman, supra*, 262 Cal.App.2d 510, 516-517.)

## III

## Cause of Action for Personal Injury and Emotional Distress

The judgment for defendant on the cause of action pled by six of the plaintiffs for personal injuries and emotional distress must be reversed not only for jury misconduct but for the additional reasons expressed below.

### (a) *Damages for Emotional Distress From Aircraft in Flight*

█ The six plaintiffs contend the court erred in excluding evidence concerning noises from aircraft in flight and in instructing the jury that "you may not award damages for emotional distress and/or physical injuries resulting from aircraft in flight." (For full text of the instruction, see fn. 2, *ante.*) The trial court's ruling and instruction were based upon *San Diego Unified Port Dist.* v. *Superior Court* (1977) 67 Cal.App.3d 361 [136 Cal.Rptr. 557], cert. den. *sub nom., Britt* v. *San Diego Unified Port Dist.* (1977) 434 U.S. 859 [54 L.Ed.2d 132, 98 S.Ct. 184]. In that case the Court of Appeal declared that an owner or occupier of property adjacent to an airport "may not recover tort damages from the [airport proprietor] for harm caused by aircraft in flight" because regulation of aircraft in flight was preempted by the federal government. (*Id.*, at p. 376.)

Following entry of the judgment in this case, our Supreme Court decided *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86 [160 Cal.Rptr. 733, 603 P.2d 1329], cert. den. *sub nom., City of Los Angeles* v. *Greater Westchester Homeowners Association* (1980) 449 U.S. 820 [66 L.Ed.2d 22; 101 S.Ct. 77] in which the court squarely held that a proprietor of an airport is not immune from liability for personal injuries and emotional distress caused by noises emanating from aircraft in flight. (*Id.*, at pp. 93, 100.) The court reasoned that while airport proprietors may not regulate aircraft in flight, they "do retain responsibility for the proper construction, operation and maintenance of ground facilities, and for land use planning designed to minimize the effects of noise" (*id.*, at p. 97) and have the power "to impose airport use restrictions to the extent that they are reasonable and nondiscriminatory." (*Ibid.*) The court noted that such power was ex-

pressly recognized by the United States Supreme Court in *City of Burbank* v. *Lockheed Air Terminal* (1973) 411 U.S. 624, 635, fn. 14 [36 L.Ed.2d 547, 555, 93 S.Ct. 1854, 1862], where the high court said: "'Airport owners *acting as proprietors* [italics in original] can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.'" (Accord: *San Diego Unified Port Dist.* v. *Gianturco* (S.D.Cal. 1978) 457 F.Supp. 283, 291, affd. (9th Cir. 1981) 651 F.2d 1306.)

The *Westchester* court thus found no reason in law or policy why the common law and statutory remedy of nuisance should not be available to protect owners or occupiers of property adjacent to an airport from personal harm. Respecting the city's role in the establishment and maintenance of the Los Angeles International Airport, the court observed: "We find significance in the depth and continuous nature of City's involvement in the creation and maintenance of the nuisance in question. City concedes that it, and not the federal government, decided to build and then to expand the airport in the immediate vicinity of a residential area. It is undeniable that City chose the particular location and direction of the airport runways. It approved their usage by jet aircraft. It entered into service agreements with commercial air carriers all with full and prior knowledge of the potential noise impact. (See *City of Los Angeles* v. *Japan Air Lines Co., Ltd.* (1974) 41 Cal.App.3d 416, 419-422 [116 Cal.Rptr. 69].)" (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra*, 26 Cal.3d 86, 98.)

*Westchester* thus makes it clear that an action for damages for personal injuries and emotional distress caused by noise from aircraft in flight is not federally preempted. (*Smart* v. *City of Los Angeles, supra*, 112 Cal.App.3d 232, 239.) To the extent that the *San Diego Unified Port Dist.* v. *Superior Court, supra*, 67 Cal.App.3d 361, held that an airport proprietor was immune from liability for personal injuries and emotional distress caused by noise from aircraft in flight, it was necessarily superseded. (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra*, 26 Cal.3d 86, 97.) Evidence concerning noise of aircraft in flight should not have been excluded and the jury should not have been instructed that damages could not be awarded for personal injury or emotional disturbance resulting from aircraft in flight.

(b) *Evidence of Actions That Could Have Been Taken by the County to Alleviate Noise Damages*

Plaintiffs' expert acoustician, Mr. Veneklasen, was asked to detail the "specific actions which, in your opinion, by changes in the method of operating this airport, noise reduction could be accomplished and has not been." Following the county's objection to the question, plaintiffs offered to prove through the expert that the county could have taken the following actions to alleviate the jet noise problem at the airport: Extend the curfew generally; vary the curfew (e.g., to permit more sleep on Sunday morning); ban private jets; ban jet taxis; ban jet aircraft sales; ban jet aircraft flight instruction; install a meaningful system to enforce noise limits; and restrict jet aircraft to those that satisfy part 36 of the federal air regulations. The court sustained the county's objection to the offer of proof.

Plaintiffs contend that the proffered evidence should not have been excluded. We agree. The types of corrective action described in the offer of proof, if shown to be reasonable and nondiscriminatory, are within the power of an airport proprietor to adopt and implement in order to mitigate the consequences of aircraft noise. (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra*, 26 Cal.3d 86, 97-100.)

█ On a related matter plaintiffs complain that the court precluded them from adducing evidence concerning the nonenforcement of a "curfew" adopted by the county. During the examination of the county airport manager, plaintiffs asked whether any punitive action had ever been taken against a curfew violator. An objection was sustained on the ground the question was irrelevant. Plaintiffs contend the ruling was erroneous because while the jury was permitted to learn that the county had enacted a "curfew" to control noise at the airport, it withheld from the jury information concerning lack of enforcement of the curfew. We agree that the question was relevant and should have been permitted. █ █ There is no suggestion that the ruling was sustainable on a ground other than relevancy.[14]

---

[14]Plaintiffs also complain that the court erroneously excluded evidence concerning assurances by the board of supervisors to the plaintiffs in 1962 that jet aircraft would not be permitted to use the airport. We discern no error in the court's ruling. The fact, if it be a fact, that the board in 1962 represented that jets would not be permitted to use the airport and six years later jets were permitted to do so does not render the 1962 representations false or fraudulent. Moreover, plaintiffs did not allege a cause of action for damages for fraud and deceit.

## IV

### CAUSE OF ACTION BASED ON
### LACK OF VALID AIRPORT PERMIT

█ Four of the plaintiffs who claimed damages for personal injuries also sought recovery on the theory that the county lacked a valid permit for the operation of the airport. The court granted a nonsuit on that cause of action and the ruling is assigned as error. We find no error in the ruling.

The State Aeronautics Act (Pub. Util. Code, § 21001 et seq.; unless otherwise indicated, all section references hereafter are to the Pub. Util. Code) provides for the issuance of airport permits. Section 21663 makes it "unlawful for any political subdivision, any of its officers or employees, or any person to operate an airport unless an appropriate airport' permit required by rule of the department has been issued by the department and has not subsequently been revoked."[15]

With reference to airports in use on June 30, 1947, such as the Orange County Airport, former section 3530 of title 4 of the California Administrative Code quoted in the margin below governed the issuance of airport permits.[16] The only state permit the county has ever received is the one issued on September 30, 1949, pursuant to the foregoing regulation.

Under existing rules and regulations the conditions which require amended permits or amended site approvals are specified in section

---

[15]Section 21663 derived from a statute providing for the development and regulation of aeronautics enacted in 1947 (Stats. 1947, ch. 1379, § 17, pp. 2937, 2938).

[16]Former section 3530 of title 4 of the California Administrative Code provided: "(a) Approval of Airports in Use. Airport site approvals shall be granted and airport permits shall be issued for any improved airports in use or ready for use on June 30, 1947, upon proper application on forms prescribed and supplied by the commission.

"(b) Terms of Issuance. Airport site approvals and airport permits shall be issued by commission under the terms of this article, without charge. They shall continue in effect so long as the airport equals the conditions set forth in the original application subject to revocation only under the conditions set forth in Article 5 hereof.

"(c) Change in Conditions. When changes involving the classification or intended use of an airport originally approved under this section are contemplated an amended site approval and permit will be required by the commission.

"(d) Annual Report Required. In order that the Commission may maintain accurate records of the physical status of all airports, an annual report will be required on forms prescribed by the Commission."

3535, subdivision (c) of the Airport Permit Regulations (Cal. Admin. Code, tit. 21 § 3535, subd. (c)) which provides: "(c) When there are changes in the use of the airport or changes in the class of the airport, an Amended Site Approval is required. When changes are made which affect conditions which have been imposed upon operation of the airport, an Amended Site Approval is required to remove the conditions or alter them. An application to the Department for an Amended Site Approval must be initiated by the airport when one is required."

Plaintiffs argue that change in use within the meaning of the foregoing regulation occurred with the introduction of jet aircraft, the addition of terminals, the construction of longer and stronger runways and their redirection, and change in the surrounding community. Plaintiffs contend that by virtue of section 21664.5 those changes required an amended permit. The section, quoted in the margin below, however, contains the following qualification: "This section shall not apply to any expansion of an existing airport if the expansion commenced on or prior to the effective date of this section and the expansion met the approval on or prior to such effective date of each governmental agency which by law required such approval."[17] Section 21664.5 was added in 1972. (Stats. 1972, ch. 1309, § 2, p. 2609, eff. Mar. 7, 1973.) There was no evidence that any expansion of the airport took place after the effective date of section 21664.5.

Section 3535, subdivision (c), requires an amended permit only when there are changes in the "use" of the airport, changes in the "class" of

---

[17]Section 21664.5 provides: "An amended airport permit shall be required for every expansion of an existing airport. An applicant for an amended airport permit shall comply with each requirement of this article pertaining to permits for new airports. The department may by regulation provide for exemptions from the operation of this section pursuant to Section 21661, except that no exemption shall be made limiting the applicability of subdivision (e) of Section 21666, pertaining to environmental considerations, including the requirement for public hearings in connection therewith.

"As used in this section, 'airport expansion' includes any of the following:

"(a) The acquisition of clear zones or of any interest in land for the purpose of any other expansion as set forth in this section.

"(b) The construction of a new runway.

"(c) The extension or realignment of an existing runway.

"(d) Any other expansion of the airport's physical facilities for the purpose of accomplishing or which are related to the purpose of subdivision (a), (b), or (c).

"This section shall not apply to any expansion of an existing airport if the expansion commenced on or prior to the effective date of this section and the expansion met the approval on or prior to such effective date of each governmental agency which by law required such approval."

the airport, or when changes are made which "affect conditions imposed upon the operation of the airport." The county maintains that none of those conditions has been shown to have occurred. We agree. Changes in the number, size or character of aircraft using the airport do not constitute a change in use within the meaning of section 3535, subdivision (c). (*Bakman v. Department of Transportation* (1979) 99 Cal. App.3d 665, 676 [160 Cal.Rptr. 583].)[18] There was no evidence of a change in the classification of the airport (see § 3535, and former tit. 4, § 3530) or that there were any conditions imposed on the operation of the airport which would have required an amended permit.[19]

Furthermore, even assuming that the county should have obtained an amended permit, there was no evidence that such failure was a proximate cause of plaintiffs' claimed injuries. Proof of violation of a statute does not automatically establish liability; a plaintiff must show that the violation was a proximate cause of his injury. (*Satterlee v. Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 590-591 [177 P.2d 279], overruled on other grounds in *Alarid v. Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897]; *Beaupre v. Nave* (1970) 13 Cal.App.3d 402, 406 [91 Cal.Rptr. 473].) The trial court properly nonsuited plaintiffs on their cause of action based on the county's alleged failure to have a valid airport permit.

## DISPOSITION

The judgment is reversed except as to the causes of action based on the alleged lack of a valid airport permit as to which cause of action the order granting a nonsuit and dismissal is affirmed.

---

[18]Plaintiffs point out that in *Bakman* the court noted that there was evidence that military jets had used the airport in question before June 30, 1947, whereas there was no evidence that jets used the Orange County Airport before the issuance of the county's permit in 1949. The *Bakman* court's observation concerning jet aircraft use of the airport does not mean that the court intended to hold that such use would constitute a change in use within the meaning of section 3535, subdivision (c).

[19]The county has also contended that plaintiffs are precluded from seeking damages for the alleged lack of a valid permit because they have not exhausted their administrative remedy. We agree with plaintiffs' response that where, as here, the action seeks damages and the administrative remedy makes no provision for damages, there is no administrative remedy to exhaust. (*Lachman v. Cabrillo Pacific University* (1981) 123 Cal.App.3d 941, 945 [177 Cal.Rptr. 21]; *Shernoff v. Superior Court* (1975) 44 Cal. App.3d 406, 410 [118 Cal.Rptr. 680].)

Plaintiffs shall recover their costs on appeal.

Morris, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied May 12, 1982, and respondent's petition for a hearing by the Supreme Court was denied July 22, 1982.