Filed 2/11/16  Valley Commercial Contractors v. Windsor Walnut Creek Apt CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VALLEY COMMERCIAL CONTRACTORS, L.P., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WINDSOR WALNUT CREEK APARTMENTS, LLC et al., <br><br> Defendants and Appellants. | A141069 <br><br> (Contra Costa County <br> Super. Ct. No. C 08-02958) |
| VALLEY COMMERCIAL CONTRACTORS, L.P. et al. <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TARGIO PROPERTIES, <br><br> Defendant and Appellant. | A141661 <br><br> (Contra Costa County <br> Super. Ct. No. C 08-02958) |

In this construction dispute, defendants Windsor Walnut Creek Apartments, LLC (WWCA) and Windsor Capital Group, Inc. (WCG) appeal from the judgment after jury trial in favor of plaintiff Valley Commercial Contractors, L.P. (Valley).  Defendant Tarigo Properties, LLC (Tarigo), joins WWCA's appeal and has filed its own appeal challenging the interest rate the trial court applied to Valley's mechanic's lien.  Valley cross-appeals from the court's denial of its motion seeking cost of proof sanctions against WWCA based on that defendant's denial of a request for admission.  We reverse the judgment as to the interest rate on the mechanic's lien.  In all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I. Construction Project Background**

**A. The Parties and Their Associates**

WWCA is the former owner and developer of real property located at 2383 Main Street in the City of Walnut Creek (City). This case arises out of the construction of a 125-unit apartment complex (Project) located on the property. The Project is a three-story wood frame structure over a concrete podium deck with two levels of subterranean parking. Patrick Nesbitt is the executive vice-president of WCG, which is a real estate development and management company. WWCA is a single purpose entity established by WCG for the development of the Project.

Valley is a general contractor. As a general contractor, Valley's job is to manage and coordinate the subcontractors who work on construction projects. Jeffrey DeWeese is Valley's president, a position he has held since 1990. Between 1990 and 2005, Valley built over 50 commercial properties, including multi-family senior housing units, multi-story office buildings, skilled nursing facilities, and government buildings. Just prior to starting work on the Project, Valley began a five-story, structural steel office building over one level of underground parking. Valley had also recently built a 125,000-square-foot warehouse, and had substantially remodeled four 17-story residential towers. While Valley had constructed both concrete and wooden buildings, prior to 2005 it had not built a combined concrete and wooden structure.

DeWeese first learned of the Project through a construction management firm called ProPM. ProPM was retained by WWCA in 2005. At that time, the Project was in the preconstruction stage.

David Zainer is an owner's representative who performs construction management services. Zainer first became aware of the Project in early 2005 when he met ProPM's owner. Zainer eventually became a half-owner of ProPM. As the owner's representative for the Project, Zainer's job included reviewing change order requests. He also served as a mentor for Nesbitt.

2

Norman Harris is a licensed architect with a company called HDO Architects (HDO). In 2004, WWCA hired HDO to design the Project. HDO retained the assistance of two structural engineers, one for the concrete portion of the Project and one for the framing portion. Three design-build subcontractors were also under HDO's supervision with respect to the design portion of their work, one each for mechanical, electrical, and plumbing (MEPs).

### B. Initial Stages of the Project

The first phase of Harris's work involved obtaining an entitlement from the City, which granted WWCA the right to build the apartment complex in advance of the submission of detailed drawings needed to secure a building permit. In 2005, he began preparing the working drawings for the Project. These drawings were compiled in the project manual, a book of about 500 pages that incorporated all of the Project's plans and specifications. Harris substantially completed the initial set of drawings sometime in 2005. The plans for the above-ground structure were not permitted until September 2006.

In September 2005, Valley and WWCA entered in to a written agreement (Construction Contract) in which Valley agreed to build the Project for the total price of $22,152,595. The Project was to be substantially completed in 20 months.[1] Valley agreed to update the work schedule on a monthly basis or at appropriate intervals as required by the work conditions. Construction on the Project began in October 2005. John Correa served as Valley's project manager. Dan Evans was Valley's project engineer.

## II. Project Delays

Much of the testimony at trial was devoted to assigning responsibility for the many delays that occurred during the course of the Project's construction. We view the evidence in the light most favorable to the judgment, accepting as true all evidence

---

[1] As it turned out, the Project was not substantially completed until June 2009.

3

tending to support it.  (See *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61 (*Bertero*); *Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1278, fn. 1.)

### A.  Delays in Obtaining City Permits

Before the Construction Contract was signed, ProPM told Valley all permits for the Project had been obtained.[2]  This turned out not to be the case.[3]  Among the permits that had not been issued were the asphalt permits and the permit for the above-ground wooden structure.  Five or six months into construction, the architectural plans for the wooden structure were still not finalized.  During that time, the City was in the process of checking HDO's plans and requesting additional information.

In February 2006, Evans received a copy of the first plan check from the City. The document contained 109 comments.  It is generally considered preferable to have plan checks done before work begins, so that any modifications or changes can be addressed ahead of construction.  Based on this first plan check, Evans concluded the plans would require much more work before the City would issue a permit.  Moreover, each of the City's inquiries could potentially result in additions to the scope of the work.

### B.  Weather-Related Delays

In the winter of 2005, the weather was difficult to work in due to excessive rain, which made it hard to remove dirt from the site during the excavation stage.  DeWeese understood that verified rain delays and delays caused by change orders would serve to extend the completion date set forth in the Construction Contract.  However, Zainer did not always approve the rain days Valley requested.  At trial, he acknowledged rain delayed the Project for many weeks.  Valley initially requested 66 rain days.  After

---

[2] Zainer testified that he did not have time to undertake a detailed review of the architectural or structural plans prior to the start of construction.  He did review the utility and soil plans, as well as the concrete structural plans, because these plans concerned the portion of the Project that was going to be built first.  He did not take any steps to insure HDO's plans for the above-ground structure were complete and final before the Project broke ground.

[3] When the Construction Contract was signed, Nesbitt knew the architectural plans had not been finalized and that WWCA had not secured all the required permits.

4

reviewing the Valley's daily field reports, Zainer determined only 40 rain days were justified.

### C. Concrete Podium Construction Delays

After excavation was completed, the next major subcontractor involved in the Project was R&G Contractors (R&G), which was responsible for building the concrete podium. Initially, R&G's work had been priced at $3 million out of the Project's total cost. Valley had not selected R&G as the concrete subcontractor. Instead, WWCA directed Valley to use R&G. Valley had never worked with this subcontractor before.

Beginning in August 2006, Evans was present on the job site, processing change orders needed to accommodate revisions being made by the structural concrete engineer. Several changes were made to the scope of R&G's work. For example, columns were added to the podium. There were also changes made at the basement level and street level. A total of 11 structural concrete plan changes were made, the majority of which resulted in requests for information (RFI's) made to HDO. Design changes had to be worked into the concrete pour schedule, and additional rebar had to be obtained.

John Packwood worked for Valley as a project superintendent. He testified that "critical path" dates were missed, starting with the mass excavation stage. Critical path dates are important for maintaining a project's schedule and completion date. R&G's work was delayed as a result of design changes, bad weather, and manpower issues. For example, the many plan revisions created confusion. The delays to R&G's work correspondingly caused delays to other subcontractors' work.

Ultimately, the concrete portion of the Project was delayed by three to four months. In addition to weather, a week or two of delay was caused by design revisions. The concrete also took longer to set than anticipated, adding another week or two. The employment of a dirt ramp at the excavation site caused at least four weeks of delay. The Project was adjacent to the Interstate 680 freeway, requiring Valley to obtain permits from Caltrans for traffic control. When trucks were needed to remove soil or access the site, permits for lane closures had to be obtained from the City. Sometimes these permits

would be denied due to weather or for other reasons, which caused delays in receiving scheduled drop-offs of materials.

### D. Design Coordination Delays

Harris acknowledged at trial that as the lead architect it was his role to coordinate the Project's design with the MEPs. As a general contractor, Valley is not licensed to design mechanical, electrical, or plumbing systems. Valley was never asked to coordinate planning between the MEPs and HDO. During the course of the Project's construction, HDO issued 85 architectural supplemental instructions (ASI's). HDO and the structural engineers were also responsible for submitting all ASI's and plan revisions to the City for approval.[4]

Much of the testimony concerning design coordination problems focused on the Project's ventilation system. As late as February 2007, Valley was involved in meetings with HDO, the MEPs, and the structural engineer to finalize the ventilation system for dryers and restroom exhaust fans. These elements were designed to be ventilated through each flooring level and up to the roof deck though a system of chases and shafts. A shaft is a fire-rated, through-floor penetration that connects one floor to another and may continue through multiple floors. It is lined on the inside and outside with fire-rated sheetrock. In addition to providing ventilation, the shaft allows pipes and mechanical ductwork to be run from floor to floor. The chase leads to the shaft and may also enclose pipes, but it is not lined with sheetrock on the inside.

The MEP's design plans utilized the same shaft to run their infrastructure through the building. The meeting with Valley was called to address the fact that there was not enough room in the wall behind the washer and dryer to house the vents with their rated enclosures as well as the plumbing and electrical infrastructure. The mechanical design-build subcontractor generated the design for the ventilation system it installed in the Project. It then gave the design to HDO to work into the architectural plans. Due to

---

[4] At one point in June of 2007, the City shut down the job site because it did not have a current set of plans reflecting the changes it had approved.

6

HDO's lack of coordination, the subcontractor had to redesign the ventilation shafts about five times, which resulted in delays. The early shaft designs were too small to accommodate everything that needed to go into the duct leading to the roof.

The overall delay in finalizing the shaft's design was significant. The design was the subject of a November 2005 meeting, yet it took another 18 months before HDO issued an ASI addressing the dimensions of the chase and the shaft's fire rating. The specifications for constructing the shafts were issued by HDO in June 2007, which was some 20 months after Valley started working on the Project.[5] Evans testified the City did not approved the new shaft design until December 2007. By the time the design was approved, the framing subcontractor had already been working on the Project for three or four months.[6]

Valley's expert witness, Joel Agnello, is an architect who specializes in forensic architectural consulting. He testified that MEPs normally prepare their designs and give them to the architect for review. The architect is in charge of the overall design and is responsible for coordinating all the designs that are contributed by others. In contrast, the actual construction of the project itself is coordinated by the general contractor.

Agnello confirmed that it is better to have the final set of plans ready before a general contractor is retained. It is also preferable to have all permits secured prior to construction. In his opinion, it would have been very difficult to meet the schedule set forth in the Construction Contract due to the lack of clear direction from the Project's design team. The design plans were poorly coordinated. This lack of coordination

---

[5] Additional revisions had to be made because fire regulations had changed since the plans were originally drafted in 2005.

[6] At one point during a walk-through while the framing was being done, Harris noted the structural engineer had drawn a joist right over the top of the shaft behind the washer and dryer. At trial, Harris acknowledged the working drawings did not reflect the correct placement of the shafts, which explains why the framing subcontractor ran joists straight through some of those shafts. As the units were being built, he advised Valley to cut the truss out. Harris testified that only two or three of the units had been framed at that point and the cost to correct the mistake was therefore limited. Valley paid for an additional subcontractor to make these fixes, hoping to be reimbursed later.

7

affected the construction, as evidenced by an excessive number of RFI's. The design problems included the failure to "cloud" the working drawings to highlight the revisions being made, a lack of sufficient architectural details within the plans, and slow responses to design-related questions, all of which negatively impacted the construction schedule.

### E. Change Orders

By 2006, the Project's plans and design had been modified "across the board." About $2 million was spent on change orders during Valley's tenure. During the course of construction, 150 to 200 change orders were issued, each one involving RFI's that required HDO to revise the working drawings. Evans testified that HDO and the structural engineers generally did not identify their revisions by clouding the plan changes or by providing an itemized list.[7] This made it difficult for subcontractors to understand what changes were being made, which delayed getting change orders priced out.[8]

The change order process was further aggravated by Zainer's demand for excessive backup documentation before approving change orders.[9] Zainer also sometimes refused to approve full payment for work that had already been done, putting Valley in the position of having to ask subcontractors to cut down their billing. Some subcontractors eventually refused to do any extra work on good faith, instead requiring final approval of change orders no matter how much this delayed the schedule.[10] Valley

---

[7] Harris admitted he ceased clouding his design revisions once construction started.

[8] If a subcontractor had a problem following the plans during construction, he or she would ask Evans for clarification. If Evans could not answer the question, he would submit an RFI to HDO. Delays in responding to RFI's slowed down the entire process. In the case of the proper method for attaching handrails, it took about seven months to resolve the issue after multiple RFI's had been submitted.

[9] Zainer would ask subcontractors to give a breakdown of labor, materials, and equipment, as well as copies of invoices for materials.

[10] For example, R&G had to provide backup documentation for work it had already done to alter structural aspects of the podium, alterations that were driven by the concrete structural engineer. R&G subsequently refused to do change order work until it was paid for the work it had already done.

8

itself did not have the resources to advance the money for the additional work on its own. At one point every individual subcontractor had a change order that was denied by Zainer.

Evans would have expected more cooperation and coordination on a job of this size. The lack of cooperation from the design professionals impacted Valley's ability to do its job as a general contractor. For example, revisions to the Project's waterproofing continued from July 2007 to May 2008. Changes were made to the plans that had not been a part of the original bidding, requiring the original waterproofing subcontractor to incorporate two years' worth of changes into his submittal package to get Zainer's approval. In the case of the HVAC contractor, the contractor's entire submittal package was rejected by Zainer even though much of the package was fine. In general, the submittal process was not streamlined, which caused delays.

### F. Construction Consultant Testimony

Benjamin Tipton worked as a construction consultant for major Bay Area construction lenders. He was hired by the banks that were financing the Project. He observed how the Project's schedule was impacted by weather delays and design coordination issues. The lack of coordination between the City, design professionals, and contractors was an issue from very early on in this project. For example, at one point the mechanical design plans had the bathroom ventilation chase dimensions at 15.5 by 15.5 inches, while HDO had drawn the dimensions at 12 by 12 inches. The structural plans also showed a joist running straight through where the ventilation was supposed to be. He concurred with the view that the architect is responsible for coordinating all the design professionals.

Tipton would visit the site and attend the monthly meetings when the pay applications came in. During these meetings, Valley regularly discussed the impact the design plans would have on change orders. He saw five to seven pages of actual or potential change orders a month. These changes impacted the Project's cost and

scheduling. Tipton always felt that Valley was acting in good faith with respect to its pay applications, and Zainer always approved them.[11]

### III. *The April 2008 Amendment to the Construction Contract*

#### A. *Valley's General Conditions Budget*

"General conditions" are expenses or costs incurred by a general contractor, such as for manpower, trailers, portable toilets, and cleanup. In the Construction Contract, Valley had originally budgeted $904,867 for its general conditions. The total actual expenditures for general conditions came to $2,206,443. The increase was due, in part, to the additional 10 to 11 months Valley worked beyond the 20-month period set forth in the Construction Contract. Valley's costs also went up because it had to hire more people to address all the design issues that arose. In the Spring of 2008, Evans was still addressing problems caused by the issuance of so many change orders.[12]

DeWeese testified that being "upside down" for over $1 million in general conditions made it difficult to make payroll and put a tremendous hardship on all aspects of his business. DeWeese eventually had several meetings with Ken Hassett, who was WCG's vice-president for construction development. DeWeese wanted to work with Hassett because he felt Nesbitt did not have enough experience.

#### B. *The Amendment*

As a result of the discussions with Hassett, Valley executed a written agreement on April 22, 2008 (the Amendment) in which Valley agreed to accept a total of $840,000 for the excess general conditions, spread over nine scheduled payments. DeWeese agreed to this deal even though he would end up losing about half a million dollars. The parties also agreed to extend the Project's completion date to August 31, 2008. The first payment was to be made April 30, 2008. However, no payments were ever made.

---

[11] Zainer testified that Valley was straightforward with their pay applications. He recommended payment of all their payment applications after revisions had been made.

[12] By May 2008, over 400 RFI's had been issued, along with various ASI's, structural revisions, and plan revisions.

### C. The Oris List

Scott Layne owns Oris Group Consulting (Oris). WWCA contacted him about the Project in April 2008. He toured the Project, concluding the work was only 50 to 60 percent completed at that time. His estimate accounted for defective work that he believed would take three to four months to correct. Oris later generated an itemized list of the existing defects for WWCA (Oris List). While Layne did not talk to any representative of Valley or ProPM, or to the architect or any designers, he concluded the Project would not be completed by August 2008. Oris eventually billed WWCA between $750,000 to $800,000 in consulting fees.

Layne did not negotiate the Amendment but he was consulted on it. By May 8, 2008, Layne was treating his task as a forensic litigation-type assignment. The first Oris List was provided to WWCA on May 19, 2008. Layne made a second site inspection on May 28, 2008. He testified that after a tour he met with DeWeese; however, at his deposition he said he did not recall if he met with anyone from Valley. While he claimed he provided Valley with a checklist to help it organize the issues that needed to be addressed, six days later he was advising Nesbitt on how to terminate Valley.[13]

At trial, Layne opined that Valley did not properly manage the Project. "A big problem" was that the MEPs "were not coordinating their design/build functions with one another," a deficiency that he attributed to Valley, not HDO. Layne testified that the design-build contractors were "subcontracted to the general contractor," and that Valley was responsible for making sure that the design-build scopes of work of each of the subtrades was completed. He opined Valley fell below the standard of care because "the MEP contractors are responsible for providing solutions—design solutions to—to preset a functioning method of completing their scopes."

Layne also reviewed all the Project's change orders and determined $412,187 in charges should not have been paid. On cross-examination, he admitted an owner is free

---

[13] DeWeese did not consider the deficiencies described on the Oris List to be serious in nature. To his knowledge, no one apart from Nesbitt considered anything on the list to describe a serious construction deficiency.

11

to approve a change order for any reason or no reason at all. The change orders he examined were all approved, and had been paid five years before trial. Accounting for legitimate delays, Layne concluded the Project should have been substantially completed by August 30, 2007. He admitted that, assuming that the parties had mutually agreed extend the completion date to August 31, 2008, his hypothetical completion date would no longer apply.

Zainer was critical of the many design revisions that occurred during the Project's construction. In recommending that Nesbitt not sever the relationship with Valley, he noted Valley was already trying to fix existing defects. In a June 2008 e-mail message, Zainer informed WWCA that the Oris List was flawed and should not be relied on.[14] He also stated: "We see no relevancy in unearthing resolved issues as a precedence for moving past this impasse. We are where we are, and the agreement that Ken Hassett forged with [Valley] on your behalf should have closed the book on those past issues and any delays that they caused." Nesbitt disagreed that Valley should be kept on the project, and Zainer was eventually phased out.

Agnello reviewed the 52 items on the Oris List and concluded only six or seven of them had any validity. Even these were minor issues. The majority of the items Oris classified as either incomplete or incorrect were in the process of being repaired or had been redesigned. The list did not provide justification for WWCA to withhold payment. He opined Valley was entitled to $1.3 million in additional general conditions.

### D. The Stop Work Notices

On June 19, 2008, WWCA issued a stop work notice. Evans stopped all new work, but continued correcting defective items. The next day Valley received an additional notice that all work must stop. Evans closed down work on the site. At this point, the Project was 80 percent complete.

---

[14] Harris was not consulted about hiring Oris and was not asked to respond to the Oris List.

DeWeese testified that he never abandoned the Project, while Nesbitt took the position that Valley had done so. DeWeese explained that he pulled everyone off the job on June 23, 2008, in response to the stop work notices. He decided not to engage in further negotiations with WWCA because he had just engaged in a series of such meetings. He believed further meetings would be pointless. The stop work notices were never retracted, but if WWCA had rescinded them, DeWeese would have returned to the Project.

### E. Valley's Mechanics Lien

On August 27, 2008, Valley recorded a lien on the property in the amount of $1,198,980.45. The amount owed for general conditions was used as the basis for Valley's lien.[15]

### F. WWCA's Side of the Contract Dispute

Nesbitt testified that WWCA changed general contractors in 2008 because Valley "was way behind schedule, and we were way over budget at that point." He also said, "Valley ultimately ended up abandoning the job, so we really had no other choice." He first considered terminating Valley in March 2008, when DeWeese reported Valley had exhausted its general condition budget. He acknowledged WWCA did not make any payments under the Amendment. He said he did not pay because DeWeese had agreed to document Valley's progress before receiving payment.

The first installment payment of $72,000 was due on April 30, 2008. When asked how much progress he expected Valley to have made between the April 22, 2008 signing and April 30, Nesbitt said: "To us, the hurdle there was we needed verification that completion of August 31 was possible." In his view, on April 30 he would receive a bill and then he would have time to verify whether the work had been done. The Construction Contract allowed WWCA 20 days for payment, and Nesbitt thought he

---

[15] Julie Young, a project manager for Valley, determined how much money Valley was owed in general conditions for the Project using a construction industry accounting system called Timberline.

13

could follow that same procedure even though the Amendment does not contain a similar provision.

On cross-examination, Nesbitt acknowledged it was Hassett's job to determine The Project's percentage of completion. In his deposition, Nesbitt testified that Hassett made a determination that Valley had not met the percentage of completion targets for May or June 2008. However, Hassett testified at his deposition that he never made any such determination. Layne advised Nesbitt to stop paying Valley, yet Nesbitt signed the Amendment six days after receiving that advice. By May 8, 2008, WWCA was already contemplating litigation against Valley.

While Nesbitt was on a "litigation path," he also envisioned a "completion path" for Valley, notwithstanding his failure to abide by the terms of the Amendment. Rather than paying Valley the first $72,000 installment payment, he planned to use the money to pay salaries and consulting fees, including Oris's consulting fees. Valley was to get whatever was left over. He wanted to present this plan to DeWeese at a meeting after the stop work notice was issued. At trial, he admitted his proposal was inconsistent with the Amendment. He also maintained Valley had "abandoned" the project, while admitting he never recalled the stop work notice.

On June 23, 2008, DeWeese told Nesbitt that Valley was in dire financial straits and expressed his view that Nesbitt was not honoring the Amendment. He offered to return to the Project if Nesbit paid the amounts that were past due. Nesbitt denied he intended to terminate Valley's contract by issuing the stop work notices. He invited DeWeese to a meeting on June 30, 2008, but DeWeese did not show up.

### G. Post-Termination Construction

Robert Putnam is a general contractor with Michael Roberts Constrution, Inc. (MRC). He contacted Nesbitt in June 2008 after he became aware that work on the project had apparently ceased. After MRC got the job, Putnam recommended that

14

WWCA hire the same subcontractors who had worked under Valley.[16]  MRC was shown the Oris List after it started the Project.  Putnam considered the Oris List in projecting the scope of MRC's work, including setting aside allowances for correcting the listed items.  Not everything on the list actually required repair.  Eventually, MRC filed a mechanic's lien on the Project to protect its rights and the rights of subcontractors that had worked under MRC.  Putnam had to notify 11 subcontractors that WWCA was withholding their retentions.  He did not agree with that decision.  Eventually MRC's lien was released.

### H.  Tarigo

Dylan Skerrett works for the Tarigo family.  In 2011 he was seeking to purchase a commercial property on behalf of the Tarigo family.  He made an offer to purchase the completed Project.  At no time before he made the offer did anyone tell him there were any construction defects.  The final purchase price was $46,950,000.

Skerrett was never given the Oris List.  Nor was he told WWCA had any reports detailing construction defects.  The property information sheet included language in which WWCA declared it had no actual knowledge of any material physical defects in the property.  Skerrett did not believe he had an affirmative duty to ask for any defect lists, because the purchase contract did ask WWCA to provide all copies of reports pertaining to the property.  WWCA offered to purchase the property back after he became aware of the undisclosed documents.  Tarigo declined the offer.

### IV.  Litigation Commences

On November 25, 2008, Valley filed a complaint against WWCA and WCG for breach of contract and to foreclose on the mechanic's lien.  The complaint alleged defendants had breached both the Construction Contract and the Amendment.  Valley requested judgment on the Construction Contract in the amount of $1,198,980.45, plus lost profits and other damages as well as interest, costs, and attorney fees.  As to the

---

[16] Tipton continued attending the monthly meeting and observed that change orders were occurring with the same frequency as when Valley had been the general contractor. When the job was completed, Tipton concluded the Project's construction was "very excellent."

breach of the Amendment, the complaint sought $840,000 in damages, plus additional lost profits and other damages, together with interest and costs.

On March 5, 2009, WWCA filed a cross-complaint against Valley alleging causes of action for breach of contract, negligence, negligent misrepresentation, conversion, and for an accounting.[17] WWCA alleged Valley's performance was deficient, forcing WWCA to issue a stop work notice, after which Valley allegedly abandoned the job. WWCA alleged it then terminated Valley for cause in August 2008.

## V. Jury's Verdict

On September 3, 2013, the jury unanimously found in favor of Valley on its claim for breach of the Amendment. By an 11 to one vote, it found Valley's damages to be in the amount of $840,000. By a nine to three vote the jury also found in favor of Valley on its quantum meruit claim in the amount of $1,058,916.12. The jury found against WWCA on its claim for breach of contract by a vote of 11 to one.

On December 16, 2013, WWCA filed a motion for new trial. The trial court denied the motion, and judgment was entered on November 21, 2013.

## DISCUSSION

## I. Juror Misconduct

WWCA claims several of the jurors committed prejudicial misconduct. We set forth the facts surrounding the misconduct and the trial court's responsive measures.

On August 2, 2013, WWCA's attorneys informed the trial court that juror No. 12 had sent Nesbitt a Facebook friend invitation. The judge noted she had observed the juror smiling at Nesbitt while he was testifying. The judge interviewed juror No. 12 and excused her. An alternate juror was sworn in. The judge then learned juror No. 12 had

---

[17] On August 26, 2013, WWCA agreed to dismiss the fraud-based claims in the operative cross-complaint. On August 27, 2013, the trial court granted Valley's motion for nonsuit on the negligence claim.

16

made inappropriate comments to other female jurors during a restroom break.[18] The judge decided to interview each of the female jurors in chambers regarding this incident.

### A. First Round of Interviews

Juror No. 2 revealed that during a recess, juror No. 12 told juror No. 5 that she did not know why the trial was continuing because the matter should have settled. Jurors Nos. 2 and 5 explained to her that both sides were entitled to present their positions. Juror No. 2 did not recall if juror No. 12 indicated which side she was leaning towards. She also reported jurors Nos. 12 and 5 had engaged in a discussion about how the evidence of damages might be presented, and had speculated that a mechanic's lien had delayed escrow when Tarigo bought the property.

Juror No. 4 also heard juror No. 12 say she had made up her mind early on and knew what she was going to do, and revealed that other jurors had also been making comments about the trial. This included "[j]ust about everybody." One juror had stated that "[Valley] deserved their money," but juror No. 4 could not remember who it was. She also said she had gone to dinner with another juror who talked about the case "a lot."[19] She heard some conversation "almost every day," but conceded she was "coming from a place where we should say nothing."

---

[18] The judge reportedly learned from court staff of juror No. 12's remarks in the women's restroom.

[19] We have read the reporter's transcript carefully and we disagree with WWCA's characterization of this "Dinner Revelation" as including that the two jurors "specifically discussed ultimate conclusions." The passage it cites to in the record does not even pertain to the dinner, but rather to conversations that occurred when the jurors were "outside the court [¶] . . . [¶] [s]ometimes right as [they were] leaving." Additionally, the discussions did *not* include ultimate conclusions: "THE COURT: So is it basically just commenting? Did they say, well, that person is obviously lying or they're a terrible witness? [¶] JUROR NO. 4: No. But—no. I can't say—that's a more swaying type of thing. It will be a personal comment about the person, you know. It would be a personal comment." WWCA relies on this same passage in asserting that juror No. 4 stated that jurors were discussing witness credibility. In fact, the passage shows she *denied* jurors were having such discussions.

Juror No. 5 reported the jurors had joked about some aspects of the trial, and had commented on its length. Juror No. 12 complained numerous times about how long the trial was taking and how it was disrupting her life.[20] Juror No. 5 had also heard comments about "theatrics" during the trial, and complaints that the proceeding was "dragging." But she had not heard anyone say they had already made up their mind.

Juror No. 6 had not heard jurors say they had already made up their minds. However, jurors did discuss the personalities and mannerisms of the lawyers.

Juror No. 11 recalled juror No. 12 stating early on that the case was going on too long and that she had already made up her mind. Juror No. 11 walked away and did not think any other juror had heard the comment. During the trial, juror No. 12 would make comments like "[w]hat the fuck do we need to know this for?" She would also send text messages and check her Facebook account during trial.

Juror No. 8 did not remember juror No. 12 making comments in the restroom. She did recall juror No. 12 saying something about how one of the subcontractor witnesses had said, "I don't recall" too much. When juror No. 8 heard comments by other jurors, she would try to shut down the conversations.

An alternate juror had heard comments expressing frustration with the lawyers. This juror may have heard juror No. 12 state that she had made up her mind, though she did not indicate which side she favored.[21] After interviewing the female jurors, the trial court concluded the jury had not been tainted by anything juror No. 12 had said.

---

[20] Once again, we disagree with WWCA's claim that juror No. 5 said juror No. 12 repeated "on 'numerous' occasions that the trial should be over and/or she had already made up her mind." The transcript reveals the opposite: "THE COURT: For instance, did you overhear [Juror No. 12] say anything about she'd made up her mind or anybody else say that? Why don't we just stop here, I've made up my mind? [¶] JUROR NO. 5: "I don't think I've heard that. . . . [¶] I just know she wanted it to be over. . . . [¶] But I didn't hear her distinctly say, I made up my mind."

[21] WWCA's claim that juror No. 12 must have been siding with Valley "because only Valley's witnesses had testified early on in the trial" is pure speculation.

## B. WWCA's Motion for Mistrial and Second Round of Interviews

On August 5, 2013, Windsor filed a motion for mistrial. Valley opposed, arguing that a properly given admonishment would cure any existing prejudice. The trial court elected to conduct a second round of interviews with the jurors, including the male jurors.

Juror No. 4 identified her dinner companion as juror No. 1, and she described his comments about the case. He had said that his notes were not good " 'but I think I'm getting this.' " He appeared to have "feelings" about the case, but she could not recall any specifics. She also divulged that juror No. 5 turned to her in the jury box at some point during the presentation of Valley's case and said something to the effect that Valley and the other contractors "need to be paid." Juror No. 4 thought a number of jurors spoke to each other, but she did not know what they had said. However, she did not think jurors were deliberating. Juror No. 12 had been the most outspoken juror. Juror No. 4 had tried to avoid her, and did not think any other jurors had been swayed by her comments.

The court reinterviewed juror No. 5 regarding the statement that the contractors "need to be paid." She denied making the statement. She admitted her opinion had gone back and forth during trial, but said she had not yet made up her mind. She did mention that she had driven by the Windsor Apartments and told her husband (who is a contractor) that her case concerned the building, but did not discuss the case with him.

Juror No. 1 acknowledged he had dinner with a juror but said they did not talk about the trial.[22] He believed all the jurors were open-minded, and that no one had decided the case. Juror No. 5 complained a lot about the hardship of being on the jury but had not discussed the trial itself.

Two other jurors had not heard anyone directly or indirectly say which side should win or that Valley and the subcontractors should get paid. Another juror said the jurors commented on personality quirks observed during the trial, but not matters that would affect their decision. A male juror had "heard certain things where I think some people

---

[22] While WWCA argues juror No. 1 "was clearly being untruthful with the court" in denying he had told juror No. 4 that Valley should get paid, Juror No. 4 never reported that he specifically told her Valley should recover.

found some witnesses more credible than others," though this point had not been discussed "elaborately." He did recall juror No. 1 said he did not feel Packwood was as credible as some of the other witnesses.

### C. Denial of Motion for Mistrial

Following these additional interviews, the trial court denied WWCA's motion for mistrial. The court concluded there had not been "repeated and pervasive misconduct." While "there was probably discussion that shouldn't have taken place, . . . as far as discussing the case or forming opinions, I think that we have dismissed the juror who was problematic here," referring to juror No. 12. WWCA's counsel then advocated for excusing juror No. 5. The court disagreed, noting juror No. 5 said her opinion vacillated both ways depending on the testimony she was hearing at the time. After denying WWCA's motion, the court strongly admonished the jury to avoid any more discussions about the case until deliberations.

### D. Although Juror Misconduct Occurred, the Misconduct Was Not Prejudicial

Jury misconduct is a ground for a new trial. (Code Civ. Proc., § 657, subd. (2).) Discussing the case with other jurors, or forming and expressing an opinion prior to deliberations is generally considered to be misconduct. (*City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 429.) "Once misconduct occurs, it raises a presumption of prejudice that can be rebutted by an affirmative evidentiary showing that prejudice does not exist, or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citation.] In reviewing the trial court's ruling on a new trial motion, we accept the trial court's credibility determinations if they are supported by substantial evidence, including all favorable inferences that may be drawn from the evidence. Whether prejudice arose is a mixed question of law and fact subject to our independent review." (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1232.)

We conclude the trial court did not err in denying WWCA's motions for mistrial and new trial.[23]  Preliminarily, there is no question that juror No. 12 engaged in misconduct before she was dismissed by the trial court.  It also appears she improperly revealed early in the trial that she was biased towards one side, although she did not explicitly disclose which side she favored.  Several other jurors were exposed to her remarks.  However, as soon as her misconduct came to light, she was immediately removed from the jury and replaced by an alternate juror.  The remaining jurors were interviewed extensively.  Based on these interviews, the trial court concluded they had not been influenced by the excluded juror.  To the extent other jurors had discussed the case, these discussions were limited to matters not pertaining to the merits, such as the attorneys' mannerisms.  Importantly, deliberations did not occur until approximately one month after juror No. 12's removal, minimizing any influence her expressed views might have had on any of the remaining jurors.  Additionally, the record contains no evidence of any subsequent juror misconduct.

The record does suggest a few jurors may have commented on some witnesses' credibility before juror No. 12 was removed.  While the evidence on this point was conflicting, particularly as to whether juror No. 1 and juror No. 5 had expressed favoritism towards Valley, nothing in the record supports WWCA's broad contention that the jury "wantonly abandoned its sworn duty to remain unbiased and unprejudiced."

The misconduct also was not prejudicial.  (Cal. Const., art. VI, § 13; *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)  The testimony as to the breach of the Amendment was not sharply in conflict.  It was uncontested that the contract was valid and that WWCA did not make any of the required installment payments.  The primary defenses for not adhering to the terms of the contract were that the original Construction Contract allowed WWCA to use delays as justification for withholding payment and that Valley had abandoned the job.  WWCA also attempted to show that defective

---

[23] WWCA appears to have analytically lumped together the trial court's rulings denying its mistrial motion and denying its subsequent new trial motion.  Because both rulings raise virtually the same issues, we will discuss them in combination.

construction was responsible for causing delays. While the Project was not completed on time, the jury could reasonably have attributed most of the delays to the design professionals' failure to coordinate their plans, and to other factors that were outside of Valley's control. The evidence also suggested WWCA intended to fire Valley even as it negotiated the terms of the Amendment.[24]

Importantly, the alleged instances of misconduct occurred more than a month prior to deliberations. The offending juror responsible for the vast majority of the improper conduct was removed without delay, and the jury was strongly admonished to refrain from any discussion of matters involving the case. Shortly after that juror was removed, all the remaining jurors informed the court that they had not been influenced by her comments. They also attested that they had not prejudged the case and affirmed they could remain open-minded until all the evidence was presented. There is no evidence to contradict the trial court's assessment that the jurors properly conducted their deliberations. Our review of the record confirms the trial court's view that removal of juror No. 12 was enough corrective action to ensure a fair trial.

Contrary to WWCA's claim, *Rufo v. Simpson* (2001) 86 Cal.App.4th 573 (*Rufo*) does not suggest a different result. In *Rufo,* the appellate court found the trial court had not abused its discretion in denying a mistrial after removing a juror who had failed to disclose that her daughter had worked for one of the prosecutors in the defendant's prior criminal trial. (*Id.* at p. 613.) The juror was removed after two and one-half days of deliberation. (*Id.* at p. 612.) The appellate court concluded the defendant had failed to demonstrate why the removal of the offending juror was not sufficient to remedy the harm in that particular case: "When juror misconduct is discovered before a verdict is reached, the trial court has a choice among several remedies, one of which is to discharge the offending juror and replace the juror with an alternate. [Citations.] Ordinarily the less drastic remedy is preferable to requiring a whole new trial; the remedy of mistrial is

---

[24] We also note the vote of the jury was not close, as it was unanimous in favor of Valley on its claim for breach of the Amendment. It also found against WWCA on its claim for breach of contract against Valley by a vote of 11 to one.

for those rare cases where the trial court in its discretion concludes the misconduct of the juror has already caused such irreparable harm that only a new trial can secure for the complaining party a fair trial." (*Rufo,* at p. 613.)

Significantly, the *Rufo* court noted "the offending juror was not included among the 12 jurors who rendered the verdict after being instructed to begin deliberations anew. In the absence of any evidence that the offending juror's previous temporary participation in deliberations tainted the other jurors, this record wholly rebuts the presumption of prejudice . . . ." (*Rufo*, *supra*, 86 Cal.App.4th at p. 613.) Here, the potential taint is even more attenuated as the offending juror was removed some five weeks before deliberations.

Stressing it was deprived of a fair trial because at least one juror (juror No. 5) had formulated and communicated "an opinion about the ultimate question in the case before the close of evidence," when she allegedly said the contractors "need to get paid," WWCA relies on *Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, 957–958 (*Andrews*). It also relies on *Deward v. Clough* (1966) 245 Cal.App.2d 439 (*Deward*). Those cases are distinguishable.

In *Andrews,* the appellate court reversed the denial of a motion for new trial and found the plaintiffs in an eminent domain proceeding had been deprived of a fair trial by reason of jury misconduct. (*Andrews*, *supra*, 130 Cal.App.3d at p. 968.) While multiple acts of juror misconduct occurred, the reviewing court observed that certain incidences of misconduct, while not trivial, "may not have been of sufficient gravity to have deprived plaintiffs of a fair trial . . . ." (*Id.* at p. 957.) These lesser incidents included a juror who remarked, "S.O.S.—same old shit," during one of the field trips to inspect the plaintiffs' homes. This same juror commented that one of the houses was not worth $90,000 because "his house which was better was not worth that much." (*Id*. at p. 957, fn. 10.) Another juror admitted she talked to her husband about the trial, but said she neither sought nor received his view of the case. During deliberations, she also commented that a realtor told her it was not unusual for a house to be on the market for several months. (*Ibid*.)

It was only when combined with multiple "serious acts of misconduct" committed by *another* juror that these lesser acts became prejudicial. (*Andrews*, *supra*, 130 Cal.App.3d at p. 957.) These serious acts included: (1) commenting during a field trip that the plaintiffs' case was "a big farce," after another juror reportedly commented that the plaintiffs already had enough money; (2) during deliberations, reporting that a real estate broker had told him that the $20,000 markdown on a plaintiff's house was not unusual; (3) talking for more than a half hour about "starter generator noise," even though no evidence had been presented on starter generator noise; and (4) repeatedly separating himself from the other jurors. (*Andrews,* at pp. 957–959.) The appellate court also deemed the juror's prejudgment of the case resulted in prejudice, emphasizing that several nine-to-three votes awarded zero damages, with this juror having voted in the majority. (*Id*. at p. 959.)

The misconduct in the present case is more akin to the lesser acts of misconduct discussed in the *Andrews* case. (*Andrews*, *supra*, 130 Cal.App.3d 944.) Assuming juror No. 5 did at one point say that the contractors "need to be paid," this misconduct does not rise to the same level as the juror in *Andrews* who said the plaintiffs' case was "a big farce." *Andrews* is also distinguishable in that there is no evidence here of *any* misconduct occurring during deliberations. Unlike the situation in *Andrews,* here the most problematic juror was removed well before deliberations occurred.[25] Further, most of the jury's votes in this case were not close. The only nine-to-three vote involved the award of quantum meruit recovery, which is not at issue in this case as Valley elected to pursue the remedy of contract damages. Other than the fact that it was not the prevailing party, WWCA does not put forth any specific argument that the jurors' voting patterns support its argument of prejudice.

In *Deward*, the Court of Appeal found the denial of a new trial motion was error where juror misconduct was clearly proved and resulted in an unfair trial. (*Deward*,

---

[25] While WWCA contends that the failure of the jurors to report misconduct on the part of the other jurors is an independent ground for reversing the judgment, it cites to no cases so holding.

24

*supra*, 245 Cal.App.2d at pp. 441–442.) On the last day of trial before arguments had been completed and the jury instructed, as the jurors came out of the courtroom and headed for the jury room but found it locked, one juror said to several others: " ' "I don't see why they don't open up the jury room now. We could bring in a verdict already." ' " The jurors who were present all laughed. (*Id*. at p. 445.) The reviewing court held that the statement showed that the juror had prejudged the case; that this "was misconduct and it was serious." (*Id*. at p. 444.) The court concluded that the misconduct resulted in an unfair trial and that the failure of the trial court to grant a new trial was prejudicial error. (*Id*. at p. 442.)

WWCA argues that juror No. 5's alleged statement that the contractors "need to be paid" was "a clear case of a juror violating his oath by pre-judging the case and expressing that opinion to other jurors." However, unlike the case in *Deward, supra*, 245 Cal.App.2d 439, the evidence was conflicting as to whether the statement was made at all. Additionally, the offending statement was made more than a month before deliberation, whereas the statement in *Deward* was made on the last day of trial. Finally, we note that all the jurors were questioned by the judge and WWCA offers no persuasive evidence that they lied to the judge about what had occurred, or about whether any of the communications had influenced them.[26] In sum, while misconduct did occur, the record falls short of showing that any of the jurors decided the case based on anything other than the evidence presented. Accordingly, we do not ascertain resulting prejudice.

We also disagree with WWCA's claim that the trial court made inappropriate comments reflecting a bias in favor of Valley. However, we need not address this issue further as it does not appear this claim was properly raised below. On that basis, WWCA has forfeited the issue on appeal. (See *People v. Samuels* (2005) 36 Cal.4th 96, 114

---

[26] While it is true that the jurors did not take the initiative to inform the court of any communications as required by Code of Civil Procedure section 1209, subdivisions (a)(6) and (a)(11), defendant does not cite to a case holding that mistrial is the appropriate sanction for such a failure.

["Failure to raise the issue of judicial conduct at trial waives claims of statutory or constitutional error."].)

## II.     *The Verdict Award Is Not Excessive*

WWCA claims the verdict of $840,000 to Valley is "impermissibly excessive because it provides for a windfall to Valley." We are not persuaded.

"The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. [Citations.] All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. [Citations.] [¶] We must uphold an award of damages whenever possible [citation] and 'can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citations.] [¶] In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Westphal v. Wal-Mart Stores, Inc*. (1998) 68 Cal.App.4th 1071, 1078.)

WWCA correctly observes the award represents the amount the jury believed Valley would have earned had it been permitted to continue working under the Amendment. It then asserts the award is contrary to law because the amounts outlined under the contract were for general conditions, not profit. It bases this assertion on evidence that general conditions are used to pay employee salaries, equipment rental, and other fixed amounts. It thus concludes Valley was not entitled to any damages for general conditions expenses that were to have been paid after the stop work notices issued.

On a motion for new trial claiming excessive damages or insufficient evidence (Code Civ. Proc., § 657, subds. 5 & 6), the trial court sits as an independent trier of fact.

26

(*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.) If the motion is granted, we apply a "highly deferential standard" (*id.* at p. 409), upholding all factual determinations with "the same deference that an appellate court would ordinarily accord a jury's factual determinations" (*id.* at p. 412); pertinent evidentiary conflicts place the new trial order "beyond review" (*id.* at p. 416). A *denial* of the motion, on the other hand, requires deference to the jury verdict, as in any claim of insufficient evidence. We affirm if any substantial evidence, contradicted or uncontradicted, supports the judgment. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571; see *Bertero*, *supra*, (1974) 13 Cal.3d at p. 64 [damages are excessive " '. . . where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice' "]; *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 414 [trial court's determination on motion for a new trial on the issue of excessive damages is usually upheld].)

Damages for breach of contract are measured as the amount that will compensate the plaintiff for the detriment caused by the breach. (Civ. Code, § 3300.) WWCA's brief does not cite to any cases holding that a contractor may never recover as a measure of damages the full amount of general conditions owed under a construction contract. Additionally, DeWeese testified he initially asked for $1.3 million to make him whole for general conditions Valley had *already* incurred.[27] He also testified that even with the Amendment, Valley still stood to lose at least $500,000.[28] As Valley notes, the effect of the Amendment was to make Valley whole for special damages that WWCA prevented Valley from recovering due to its issuance of the stop work notice.[29]

---

[27] The mechanic's lien Valley filed was for approximately $1.1 million, but Valley's project manager Julie Young determined Valley was actually owed $1.3 million.

[28] The $840,000 sum consisted of payment towards current general conditions of $360,000 and prior general conditions of $480,000.

[29] Special damages for breach of contract are limited to losses that were either actually foreseen (see, e.g., *Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 586 [in contract negotiations, supplier was put on notice that its failure to perform would result in lost profits]) or were "reasonably foreseeable" when the contract was formed. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.) Here,

It is undisputed that WWCA had made no payments under the Amendment. Thus, accepting "every reasonable inference and resolving all conflicts" in Valley's favor, the jury's award of $840,000 to Valley is not excessive.

## III. Evidentiary Rulings

WWCA claims the trial court erred by improperly excluding certain evidence, and by limiting the testimony of various key witnesses. It also claims the court allowed the admission of highly prejudicial evidence having little or no probative value. We address these allegations in turn, and conclude they lack merit.

### A. Packwood's Testimony

WWCA asserts the court prevented it from introducing statements by Packwood that purportedly would have shown Valley "repeatedly breached its contract" and "performed its work in bad faith in several instances." The two statements were: (1) that DeWeese told him to stop preparing daily field reports for WWCA, and (2) that Correa instructed Packwood to install joists in the shafts even after HDO instructed Valley not to, so that Valley could charge WWCA to remove them.

In its argument, WWCA does not cite to any point in the trial transcript in which Packwood was prevented from testifying that he was instructed by DeWeese to stop preparing daily field reports. However, in the brief's statement of facts WWCA states: "On or about July 17, 2013, the trial court prevented [WWCA] from obtaining certain testimony from [Packwood] relating to conversations he had with [DeWeese and Correa], regarding Windsor's claims of Valley's bad faith conduct and its defective construction."

WWCA cites to testimony during Packwood's cross-examination in which he twice was asked questions that called for hearsay. He first testified he had sent the reports to WWCA only when asked, and that Correa (not DeWeese) had told him not to send them on a daily basis. WWCA's counsel then asked: "And did he tell you why he didn't want ownership to get the daily field reports?" Valley's counsel made a hearsay

---

WWCA was aware of Valley's position that it had already expended funds for general conditions and the Amendment was intended, in part, to allow Valley the opportunity to recover a significant portion of these expenditures.

28

objection, which was sustained. At this point, WWCA's counsel did not argue for any exception to the hearsay rule. The second citation in WWCA's brief is irrelevant. Confusingly, there is neither an objection nor a ruling at the cited page.[30]

WWCA later raised the issue with the trial court outside the presence of the jury, arguing that the party admission exception applied. Evidence Code section 1222 states: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence." The court ruled the question called for hearsay, was not relevant, was not an admission, and called for speculation. The court offered that WWCA's counsel could ask Correa what he had said to Packwood if Correa came to testify. Correa did not testify at trial.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question. [Citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) We agree that the evidence WWCA sought is not relevant. WWCA overstates the impact of the excluded testimony, arguing "[h]ad this evidence been admitted, the jury would have seen that Valley repeatedly breached its contract with [WWCA] and performed its work in bad faith in several instance." This argument is difficult to follow, as WWCA does not cite to any contractual provision requiring Valley to send daily field reports.

Even if the trial court abused its discretion by excluding the testimony, we conclude the error was not prejudicial. "The burden is on the appellant in every case to

---

[30] WWCA also cites to Packwood's *posttrial* declaration attached to its motion for new trial. In the declaration, he states that "Correa told me, '[t]hey [Windsor] don't need to know what's going on up here, and I don't pay you to prepare and send these DFR's to them . . . . If they want to know what's happening, they're going to have to pay for it.'"

29

show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice." (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; see Cal. Const., art. VI, § 13; Evid. Code, § 354.) In its reply brief, WWCA claims the excluded testimony "would have showed the jury that Valley was not keeping records of its progress and was not being truthful with Windsor regarding the work that was being done, the percentage of work completed, and the status of the corrections being made." This is also an overstatement. The evidence WWCA sought to introduce did not prove Valley misrepresented the progress of its work, only that it was disinclined to prepare WWCA with daily reports. Accordingly, we conclude the error, if any, was harmless.

As to the placement of joists in the shafts, WWCA does not cite to the transcript where this evidence was supposedly excluded, relying instead on Packwood's posttrial declaration. In its reply brief it also cites to testimony that it claims shows Packwood "was *prevented* from testifying about Valley's instructions to ignore what the architect said and continue framing units that had problems with joists running through the dryer vent shafts." (Italics added.) He actually testified that he was instructed by Correa to continue framing because a fix would occur at a later date if one ever did occur. WWCA's counsel did not ask any more questions about the conversation. Consequently, WWCA's claim that the trial court *prevented* it from introducing testimony that "Valley wanted to charge [WWCA] to remove [the joists]" is unsupported by the record.

### B. *Exclusion of the Opinions of WWCA's Architect*

The trial court ruled that Harris could not offer opinion testimony because he had not been properly disclosed as an expert witness. On cross-examination, Harris acknowledged he had never been designated as an expert witness. He also affirmed he was unable to attribute any of the Project's delays to defective construction. WWCA claims Harris was improperly prohibited from testifying as to his observations and opinions of Valley's work with respect to such matters as his "serious concerns" about the framing and "problematic" conditions involving the concrete. The trial court sustained Valley's objections to such testimony on the grounds that it constituted impermissible expert opinion.

30

WWCA first asserts that Harris was giving testimony as a fact witness, not an expert, because he was testifying about his own observations, conclusions, and actions regarding Valley's work. It is established that " '[t]he need for pretrial discovery is greater with respect to expert witnesses than it is for ordinary fact witnesses [because] . . . . [¶] . . . the other parties must prepare to cope with witnesses possessed of specialized knowledge in some scientific or technical field. They must gear up to cross-examine them effectively, and they must marshal the evidence to rebut their opinions.' " (*Bonds v. Roy* (1999) 20 Cal.4th 140, 147.) We conclude the trial court properly prohibited Harris from testifying as to his opinions on the quality of Valley's work, notwithstanding the fact that he was also a percipient witness. (See *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1681–1684 [percipient witness not listed as an expert improperly permitted to testify as to expert medical opinion], disapproved on other grounds in *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 41.)

WWCA relies on *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31 (*Schreiber*) for the proposition that nonexpert witnesses may give opinions over matters to which they have personal knowledge. That case is not on point. In *Schreiber,* the Supreme Court held that a treating physician does not become a "retained" expert within the meaning of Code of Civil Procedure section 2034, subdivision (a)(2) (requiring the submission of an expert witness declaration) whenever such a physician gives opinion testimony. (*Schreiber*, at pp. 35–36.) Unlike the present case, in *Schreiber* the treating physicians had been designated as expert witnesses. (*Id*. at p. 34.)

Alternatively, WWCA asserts Harris was qualified to offer expert testimony because he was designated as a nonretained expert by Valley in each of its expert witness designations and WWCA had reserved its right to call any experts listed by Valley. However, Valley points out that it subsequently withdrew the nonretained experts in its amended disclosure. In its reply brief, WWCA contends Harris could nevertheless offer expert testimony at trial because Valley did not withdraw its designation until after WWCA reserved its rights and after he had been deposed. However, the case it relies on,

31

*Powell v. Superior Court* (1989) 211 Cal.App.3d 441, is inapposite because it did not address the utilization of experts after a designation has been withdrawn.  In sum, WWCA has failed to demonstrate error in the exclusion of the proffered testimony.

### C.  Limitation of Putnam's Testimony

WWCA also claims the trial court erred in sustaining Valley's objections to Putnam's testimony regarding the cost to complete the framing after MRC took over the Project in October 2008.  It asserts the testimony was relevant to show the costs to remedy Valley's allegedly defective work, as well as to challenge Valley's credibility regarding its position that it had completed 100 percent of the framing.  The trial court sustained Valley's objection to testimony based on relevance.  Valley's counsel also noted that Putnam had not been designated as an expert witness and therefore he could not identify what caused the need to make corrections to the framing.  For example, damage could have occurred because the framing was exposed to the weather for some months before MRC took over the Project.  Additional framing work could also have been prompted by City inspections and design changes.

In yet another posttrial declaration submitted along with WWCA's motion for a new trial, Putnam declared that MRC had charged "a total of $504,865 to remedy all of the items on the Oris defect list as well as other non-conforming work that MRC found in the field."  Given the state of the evidence at the time of Putnam's testimony, including an apparent lack of expert testimony as to how much of MRC's charges were attributable to Valley's faulty work, we cannot say the trial court abused its discretion in excluding the proffered testimony.[31]

### D.  Exclusion of Notice to Cure

At trial, WWCA attempted to introduce an August 1, 2008 letter prepared by its trial counsel as evidence that a notice to cure was issued to Valley.  WWCA directs us to

---

[31] WWCA argues that all the framing costs were due to Valley's breaches and "*ultimate abandonment* of the Project in June 2008."  (Italics added.)  As we must view the evidence in a light most favorable to the verdict, we cannot agree with WWCA's characterization of Valley's conduct.

a portion of the reporter's transcript taken during Nesbitt's testimony. It appears that by this time, the trial court had already sustained Valley's objection to the admission of the letter. Regardless of whether the letter was admissible, WWCA fails to show its exclusion was prejudicial.

On June 20, 2008, WWCA issued the last of the stop work notices, directing Valley to immediately cease all work. While WWCA claims the notice to cure was evidence that it "made an attempt to get Valley to comply with its contractual obligations before terminating Valley, it is indisputable that the notice was sent *after* WWCA imposed this final stop work notice. The August 1, 2008 letter contains no language recalling the stop work notice and it does not purport to be a return to work notice. It is thus unclear how Valley could have complied with its "contractual obligations" after receiving the letter.[32] Accordingly, the letter is not relevant as to whether Valley was in breach of contract.

### E. Admission of Allegedly Prejudicial Evidence

WWCA claims the trial court erred in allowing Valley to elicit testimony from several witnesses revealing that MRC and certain subcontractors had not been paid their final retention. It asserts this testimony served no relevant purpose and should have been excluded because it was highly prejudicial. It also asserts the court wrongly allowed evidence of the sale price of the finished building. We find no error.

As to the first point, WWCA provides numerous citations to the reporter's transcript concerning the unpaid retentions,[33] but concedes in its reply brief that the only

---

[32] Nesbitt testified he was aware that in order for Valley to return to the job he needed to issue a return to work notice. He conceded he never did so.

[33] For example, the waterproofing subcontractor testified he was never told his work was deficient. By the time he ceased working on the Project, he was owed approximately $150,000. He was never paid. WWCA also did not pay the mechanical subcontractor's retentions even though all of its work passed City inspection. A drywall company's work also always passed City inspection. It received a stop work notice in May 2008. At that time, it was owed $196,748. The company returned to the Project about four months later. WWCA did not make payments. MRC terminated it because the company's owner refused to increase his manpower. At the time of trial, he was owed $236,000.

33

time it objected to this evidence at trial was during Putnam's testimony. As to all the other instances, WWCA failed to preserve this issue for appeal. (See Evid. Code, §§ 353, 354; and see *People v. Rogers* (1978) 21 Cal.3d 542, 548.) By the time Putnam testified, the jury had already heard testimony that some subcontractors had not been paid.[34] Therefore, even if the trial court erred in allowing Putnam's testimony, WWCA was not prejudiced thereby.

The problem with WWCA's challenge to the sale price evidence is that the only "testimony" WWCA claims was improperly admitted is not testimony at all, but rather is the opening statement of Valley's counsel. Notably, WWCA did not interpose any objections to the statement. The jury was also read CACI No. 3925, which expressly advises that arguments of counsel are not evidence and that the verdict must be based on the testimony of witnesses and other evidence.[35] We find no error.

## IV. *Inclusion of WCG as a Judgment Debtor*

On July 25, 2013, WCG moved for a nonsuit, arguing that it was not an owner of the Project. Valley's counsel responded that WCG is specifically referenced in the Amendment. He moved to amend Valley's complaint to conform to proof. The nonsuit motion was deferred and the motion to amend was granted. On appeal, WCG claims the reference to it in the Amendment must be deemed a typographical error because it was not a contracting party to the original Construction Contract. It contends judgment was improperly entered against WCG.

The Amendment itself specifies that it is an "AGREEMENT BETWEEN WINDSOR CAPITAL GROUP, INC. AND VALLEY COMMERCIAL CONTRACTORS, L.P." Nesbitt signed the Amendment and testified that he was the executive vice-president of WCG. He also offered testimony indicating that WCG

---

[34] Contrary to WWCA's brief, the testimony at trial was that MRC was paid its final retention.

[35] WWCA's related claim that the trial court "prevented" Nesbitt from testifying as to the true costs WWCA incurred finds no support in the record. (See Cal. Rules of Court, rule 8.204(a)(1)(C); and see *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745 [appellant's responsibility on appeal to accurately cite the record].)

viewed itself as a party to the agreements with Valley. This contradicts the claim that the reference to WCG was "clearly a mere typographical error."

Regardless, the doctrine of invited error applies here. "Under the doctrine of invited error, a party may not complain of the giving of a particular instruction that he or she individually or jointly requested. [Citations.] This rule is designed to prevent one whose conduct induces or invites the commission of error by the trial court from later taking advantage of it." (*Demkowski v. Lee* (1991) 233 Cal.App.3d 1251, 1257.) The jury instructions presented to the trial court after nine weeks of trial were jointly submitted by the parties. CACI No. 300 is the predicate for all of the contract damages instructions and expressly instructs the jury that Valley entered into a contract and an amendment with both WWCA and WCG. We disagree with WCG's contention that the doctrine should not apply because this jury instruction was "non-substantive."

Relying on *Demkowski v. Lee*, *supra*, 233 Cal.App.3d at p. 1257, WWCA claims the doctrine of invited error "was not meant to provide a litigant with a windfall in the event of a scrivener's error." Once again, the authority is not on point. In that case, the defendant did not object to the jury instruction. However, she *did* object to the verdict forms adopted by the court, claiming they permitted a double recovery against her. (*Ibid*.) Here, WCG did not object to the relevant instructions or verdict forms. Accordingly, the argument has been waived.

## V.     *Award of Prejudgment Interest*

The jury awarded Valley $370,944 in prejudgment interest based on the progressive payments owed to it under the terms of the Amendment. WWCA claims Valley is not entitled to receive any prejudgment interest under Civil Code section 3287. It asserts the trial court erred in awarding such interest because the amount Valley claims it was owed is uncertain. It argues that the only certain amounts owed to Valley were limited to the installment payments scheduled to occur prior to the stop work notice. The trial court expressly rejected this argument. We review the trial court's prejudgment interest award for legal error. (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 27–28.)

35

The purpose of prejudgment interest is to compensate the prevailing party for the loss of money during the period before the judgment is entered. (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) Civil Code section 3287, subdivision (a) states, in pertinent part: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, . . . is entitled also to recover interest thereon . . . ." "The test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether '*defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount.' " (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1789.) " ' "A dispute as to the price agreed, or as to the amount of work done or its cost, will not prevent the allowance of interest. . . . Where the data necessary to determine the amount due are supplied to the debtor by an invoice or statement, he will be charged with interest for failure to pay." ' " (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 690.)

The jury here evidently chose the $840,000 figure for damages on the breach of contract claim because that was the amount WWCA failed to pay under the Amendment. The trial court noted the contract "stated the amounts due and the dates the amounts were due, and those were the amounts awarded by the jury. Nothing more is needed to show 'damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day.' " We agree and find no error.

## VI.    *Rate of Prejudgment Interest*

As part of the judgment entered on November 21, 2013, Valley was authorized to foreclose the mechanic's lien it recorded upon the Project, which is under Tarigo's ownership. The total award was $1,198,980.45, comprised of $840,000 for WWCA's breach of contract and $318,980.45 in prejudgment interest. The trial court later increased the prejudgment interest award to $370,944 to account for the fact that the judgment was entered later than had been anticipated. The interest rate was calculated at

a rate of 8 percent "under [Valley's] agreement with defendants and Civil Code Sections 3287 and 3289."

In its separate brief filed in this appeal, Tarigo argues that the prejudgment interest rate of 8 percent should be reduced to 7 percent based on *Palomar Grading & Paving, Inc. v. Wells Fargo Bank, N.A.* (2014) 230 Cal.App.4th 686 (*Palomar*), an opinion issued after the trial court's ruling. In *Palomar,* the appellate court held that the constitutional default rate of 7 percent should apply to prejudgment interest on a mechanic's lien as applied to noncontracting, innocent owners. (*Id*. at pp. 689–690.)

Valley asserts Tarigo is precluded from contesting the 8 percent prejudgment interest rate by the doctrines of waiver and invited error. It also asserts the instant case is "readily distinguished from *Palomar*." The issue was not waived. Because *Palomar* was a case of first impression (*Palomar*, *supra*, 230 Cal.App.4th at p. 689) and was decided after the judgment appealed from, Tarigo cannot be faulted for having failed to raise the interest rate issue below. Similarly, while it is true that Tarigo concurred with the 8 percent figure in the proceeding below, it did not invite any error.

In *Palomar*, *supra*, 230 Cal.App.4th 686, a general contractor had contracted with two subcontractors who were not paid for substantial portions of their work. The landowners never entered a contract with the two subcontractors. (*Palomar, supra*, 230 Cal.App.4th at pp. 688–689.) The appellate court held that prejudgment interest on a mechanic's lien should not be calculated based on rates applicable to breach of contract where, as here, the innocent property owner was not a party to the contract or a participant in its breach. Rather, under such circumstances, "it is the constitutional default rate that should apply to prejudgment interest on a mechanic's lien . . . ." (*Id*. at p. 690.) As the court explained, the default rate of interest prescribed by the Constitution in Article XV, section 1, sets the interest rate at 7 percent for the " 'forbearance of any . . . *things in action*.' " The court noted that "[t]hings in action obviously include the right to foreclose on a mechanic's lien," and found that as to noncontracting, innocent owners, the constitutional default rate applied, rather than the 10 percent rate specified by

37

Civil Code section 3289, subdivision (b), that otherwise would have applied.[36] (*Palomar*, at pp. 689–690.)

We concur with the reasoning in *Palomar, supra*, 230 Cal.App.4th 686. Like the landowner in that case, Tarigo was not a party to any of the underlying contracts. The judgment is reversed insofar as it provides for a rate of prejudgment interest at 8 percent and is remanded for a recalculation at the rate of 7 percent.

## VII.   WWCA's Motion to Tax Costs

WWCA claims the trial court abused its discretion in awarding Valley virtually all of its costs ($1,364,188.84 out of $1,404,051.55), asserting Valley failed to provide admissible evidence to support the vast majority of its claimed costs. Specifically, WWCA challenges the awards for deposition costs, service of process, and witness fees. It claims Valley failed to provide the proper documentary support for these alleged costs, and contends several charges were unreasonable and not permitted under Code of Civil Procedure section 1033.5. It also argues that many of the costs sought by Valley were discretionary, and not reasonable or necessary.

On January 29, 2014, Valley's attorney, William S. Kronenberg, prepared a declaration in support of Valley's opposition to the motion to tax costs. In his declaration, he noted that the number of individual expenses and costs incurred on Valley's behalf could not be examined without an undue expenditure of time and without partially waiving attorney-client and attorney work product privileges. He indicated his firm had lodged unredacted invoices reflecting all of the expenses and costs for the trial court's in camera inspection.

On February 11, 2014, the trial court held a hearing on WWCA's motion to tax costs.

On March 18, 2014, the trial court filed its order after hearing. As to the deposition costs, service of process, and witness fees, the court overruled all of WWCA's

---

[36] Civil Code section 3289, subdivision (b), provides:  "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

objections. With respect to the witness fees, the court stated: "Mr. Kronenberg's declaration states an adequate basis and provides acceptable documentation for this item. It is noted that Valley as both plaintiff and defendant is entitled pursuant to CCP 998 to recover expert witness costs pre- and post-settlement offer, since it achieved a more favorable outcome than the CCP 998 offer."

As the prevailing party, Valley had the right to recover costs. (Code Civ. Proc., § 1032, subd. (b).) The burden of proof on a motion to tax costs depends upon the nature of the costs being challenged. "If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.) All of the costs at issue in this appeal are specifically recoverable by statute. WWCA therefore had the burden of proving them unreasonable and/or unnecessary. We review the trial court's decision on appeal for abuse of discretion. (*Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 990.)

While WWCA raises numerous allegations as to Valley's alleged failure to provide backup documentation to support the majority of its costs, WWCA does not does not deny that the trial court conducted an in camera review of Valley's privileged supporting documentation, thereafter concluding the costs were reasonable and justifiable. WWCA did not request a statement of decision from the court, nor did it cause a transcript of the hearing on the issue to be prepared. "All intendments and presumptions are indulged to support [the trial court's order] on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) WWCA has failed to demonstrate error.

## VIII. *Nonsuit on WWCA's Negligence Cause of Action*

Finally, WWCA contends the trial court erred in granting Valley's nonsuit as to its negligence cause of action.

On August 26, 2013, Valley renewed a motion for nonsuit that the trial court had previously deferred upon ruling. The parties orally argued their respective positions regarding the merits of the nonsuit motion, and WWCA also submitted a written brief on the issue for the court's consideration.

On August 27, 2013, the trial court granted the motion for nonsuit. The court did not make a record of its rationale for granting the nonsuit, and WWCA did not request such a record.

"A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.) Nonsuit is appropriate where the plaintiff's proof raises nothing more than speculation, suspicion, or conjecture. (*Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 198, fn. 1.)

In reviewing a grant of nonsuit, the appellate court evaluates the evidence in the light most favorable to the plaintiff. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) The judgment of nonsuit will be affirmed if a judgment for the defendant is required as a matter of law, after resolving all presumptions, inferences and doubts in favor of the plaintiff. (*Ibid.*) The review of a grant of nonsuit is de novo. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542.)

The parties agree that the trial court's decision to grant the nonsuit motion was based on its finding that WWCA had not offered sufficient evidence of causation. WWCA argues causation could have been shown by evidence of the costs to repair the construction defects that allegedly occurred under Valley's watch, evidence that the court "erroneously excluded." The evidence WWCA cites to includes the testimony from Putnam that we have already found was properly excluded.

The problem here, which we have already discussed above, is that there was no admissible evidence as to the cost of repairs attributable to Valley, as opposed to costs

that were incurred to remediate weather damage or design flaws. It was uncontroverted at trial that only some of the repairs were related to poor workmanship by Valley's subcontractors. The rest was attributable to weather, plan corrections, new designs, and the costs spent to complete the Project itself. Because WWCA failed to isolate the charges attributable to Valley, the motion for nonsuit was properly granted.

## IX.    Denial of Valley's Motion for Attorney Fees

Valley cross-appeals from the trial court's ruling denying its motion for attorney fees. The motion was based on WWCA's alleged failure to reasonably admit a request for admission. Code of Civil Procedures section 2033.420 (section 2033.420) at subdivision (a) provides: "If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees."

The trial court's ruling on a section 2033.420 motion is reviewed for an abuse of discretion. (*Miller v. American Greetings Corp.* (2008) 161 Cal.App.4th 1055, 1066.) "The determination of whether 'there were no good reasons for the denial,' whether the requested admission was 'of substantial importance,' and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court. [Citation.] By contrast, if the trial court exercises its discretion and determines that the requirements of the statute exist, reasonable expenses *must* be awarded. [Citation.] On appeal, the trial court's decision will not be reversed unless the appellant demonstrates that the lower court abused its discretion." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 508.)[37]

---

[37] We disagree with Valley's contention that we must review this issue under the de novo standard of review.

On appeal, Valley contests the trial court's ruling with respect to its request for admission No. 1. This request asked WWCA to "[a]dmit propounding party is not liable to responding party for breach of contract as alleged in responding party's second amended cross-complaint's first cause of action." WWCA unequivocally denied the request. Reiterating that the jury ultimately found Windsor's denial was wrong and that Valley did not breach the contract, Valley asserts the court erred as a matter of law in denying its right to attorney fees.

Subdivision (b) of section 2033.420 provides: "The court shall make this order [to pay reasonable expenses] unless it finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." "In evaluating whether a 'good reason' exists for denying a request to admit, 'a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial.' " (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1276.)

As the trial court noted in its ruling, at the point at which this request was served, more than two years before trial, WWCA had reasonable grounds to believe it would prevail on its cross-claim that Valley had breached the initial 2005 Agreement by failing to complete the Project in a timely and workmanlike manner. While Valley quarrels with this finding, we cannot say that WWCA acted in bad faith in pursuing its cross-claim. Indeed, it would be unreasonable to expect WWCA to admit such a request in the beginning stages of litigation and effectively forfeit its right to present evidence and have

its claim decided by a jury.[38]  Accordingly, we find no abuse of discretion in the court's denial of attorney fees for Valley's cost-of-proof.[39]

**DISPOSITION**

The judgment is reversed as to the interest rate on the mechanic's lien.  The matter is remanded for the calculation of interest on the mechanic's lien at the legal rate of 7 percent.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

---

[38] We need not address WWCA's additional argument that Valley failed to present competent evidence to establish its costs-of-proof.

[39] Valley requests a "voluntary partial dismissal of its severable cross-appeal of the trail court's February 11, 2014 and March 18, 2014 post-judgment orders on costs in this case."  Not surprisingly, WWCA does not oppose the request.  The balance of Valley's cross-appeal is dismissed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.

A141069/A141661

44